STATE OF CONNECTICUT *v.* WAYNE B. ALEXANDER
(10342)

PETERS, C. J., HEALEY, SHEA, SANTANIELLO and CALLAHAN, Js.

Argued June 12—decision released August 6, 1985

*Jean E. Blue,* special assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellant (defendant).

*Susan C. Marks,* special assistant state's attorney, with whom, on the brief, were *Harry S. Gaucher, Jr.,* state's attorney, and *John M. Massameno,* assistant state's attorney, for the appellee (state).

PETERS, C. J. The principal issue in this case is whether a private citizen was acting as an agent of the police when he engaged the defendant in conversations in the course of which the defendant made incriminatory statements. The defendant, Wayne B. Alexander, was charged by indictment with having committed the crime of murder in violation of General Statutes § 53a-54a. A jury found the defendant guilty as charged and the trial court rendered judgment in accordance with the jury verdict. The defendant appeals from the judgment of conviction.

The jury could reasonably have found the following facts. The victim, Vern Alan Cook, and the defendant were scheduled to appear in court at Rockville in January of 1979 to answer to criminal charges of larceny in the third degree. In the early morning of the date on which they were to appear, the courthouse was seriously damaged by fire, and their court appearances were continued to February 6, 1979. On February 5, 1979, the victim made arrangements with his mother for a ride to court on the following day, but he failed to meet his mother as planned, and never appeared in court.

The defendant admitted to the police, on March 9, 1979, that he had set the Rockville courthouse fire and he implicated the victim as his accomplice in the arson. As a consequence of these admissions, he was arrested and incarcerated at the Hartford correctional center.

At his own request, he was there visited on several occasions by James Papagolas, who had befriended both the defendant and the victim. On March 19, 1979, the defendant acknowledged to Papagolas that he had killed the victim. Papagolas immediately informed the police about his conversation with the defendant. In part because Papagolas' driver's license had been suspended and his car was out of order, the police thereafter drove Papagolas to the correctional center whenever he paid further visits to the defendant. On March 29, 1979, the defendant told Papagolas where the victim's body had been buried. Papagolas led the police to the wooded area that the defendant had described, where they found the body.

The defendant raises two issues in his appeal from his conviction for murder. He claims that the trial court erred: (1) in refusing to suppress the testimony of James Papagolas concerning the incriminatory statements made to him by the defendant; and (2) in refusing to dismiss the grand jury indictment against him.

I

In the defendant's challenge to the admissibility of testimony concerning his incriminating statements, the defendant relies upon his constitutional rights under the fifth and sixth amendments to the United States constitution. He maintains that he was unconstitutionally interrogated in violation of his privilege against self-incrimination under the fifth amendment because he did not receive the warnings mandated by *Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), before he made the statements to Papagolas. Alternatively, he argues that he was unconstitutionally interrogated in violation of his rights under the sixth amendment because his conversations with Papagolas took place in the absence of his counsel, in contravention of the rule of *Massiah* v. *United*

*States,* 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964).[1] As the defendant concedes, however, a necessary predicate to both constitutional claims is a determination that the incriminating statements to Papagolas that the defendant seeks to suppress were in fact elicited from the defendant as a result of interrogation by Papagolas acting as a police officer or as an agent of the police. See *United States* v. *Henry,* 447 U.S. 264, 269–70, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980) (sixth amendment); *State* v. *Zeko,* 176 Conn. 421, 424, 407 A.2d 1022 (1979) (fifth amendment).[2] In order to prevail on these claims, therefore, the defendant must persuade us that the trial court erred in its conclusion, after a suppression hearing,[3] that "[t]he incriminating statements challenged were made by the defendant to a private citizen, not a 'police agent or informer.' " We are unpersuaded and accordingly find no error.

There is no bright line test for determining when a private citizen is acting as an agent of the police. *Thomas* v. *Cox,* 708 F.2d 132, 136 (4th Cir.), cert.

---

[1] Although in the trial court the defendant adverted to his rights under the Connecticut constitution as well as to his rights under the United States constitution, he has not on this appeal proffered any argument that the rights afforded to him by the federal and state constitutions are in any way distinguishable. In the absence of such an argument, in our discussion of the constitutional claims raised herein we will, in the circumstances of this case, deem the defendant's rights under the state constitution to be coextensive with his rights under the federal constitution.

[2] Our disposition of this threshold issue obviates the necessity of considering other possible impediments to the defendant's constitutional claims under either the fifth amendment; see *United States* v. *Henry,* 447 U.S. 264, 272, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980); *State* v. *Vollhardt,* 157 Conn. 25, 36–37, 244 A.2d 601 (1968); *State* v. *McDonald,* 387 So. 2d 1116, 1120 (La. 1980); or the sixth amendment. See *State* v. *Biller,* 190 Conn. 594, 615–16, 462 A.2d 987 (1983).

[3] At trial, before Papagolas took the stand, the court reconsidered and again denied the defendant's motion to suppress. The defendant subsequently made motions to strike Papagolas' testimony, and for a mistrial, both of which the court denied.

denied, 464 U.S. 918, 104 S. Ct. 284, 78 L. Ed. 2d 262 (1983). Courts in various jurisdictions considering the question of agency, primarily in the context of a claimed right to counsel under the sixth amendment, have sought guidance from the United States Supreme Court's opinion in *United States* v. *Henry,* supra. In Henry, the court held that the government had "deliberately elicited" incriminating statements from an incarcerated defendant in violation of his sixth amendment right to counsel when it placed a paid undercover informant in close proximity to the defendant. *United States* v. *Henry,* supra, 270, 276. Although *Henry* did not specifically address the question of agency, the court's opinion identified some of the basic characteristics of the agency relationship. "In *Henry,* the Court considered it critical that the informant, previously in the government's paid employ in similar missions, was specifically contacted by the government and given his charge respecting the procurement of possibly incriminating information from Henry. Also important to the *Henry* Court was the fact that the informant's mission was on a 'contingent-fee' basis, *Henry,* 447 U.S. at 270, 100 S. Ct. at 2187, thereby demonstrating a formal 'prearrangement,' *id.* at 273, 100 S. Ct. at 2188, between state and informant . . . . From these circumstances the Court in *Henry* was able to characterize the informant as a 'Government agent expressly commissioned to secure evidence,' *id.* at 273; 100 S. Ct. at 2188, from the accused." *Thomas* v. *Cox,* supra, 135.

The existence of an agency relationship thus turns upon a number of factual inquiries into the extent of police involvement with the informant. Those inquiries include the following: whether the police have promised the informant a reward for his cooperation or whether he is self-motivated; see *Thomas* v. *Cox,* supra, 135; *Lightbourne* v. *State,* 438 So. 2d 380, 386 (Fla.

1983), cert. denied, 465 U.S. 1051, 104 S. Ct. 1330, 79 L. Ed. 2d 725 (1984); whether the police have asked the informant to obtain incriminating evidence and placed him in a position to receive it; see *United States* v. *Brown,* 466 F.2d 493, 495 (10th Cir. 1972); *People* v. *Odierno,* 121 Misc. 2d 330, 334, 467 N.Y.S.2d 968 (1983); and whether the information is secured as part of a government initiated, pre-existing plan. See *United States* v. *Panza,* 750 F.2d 1141, 1152 (2d Cir. 1984); *Thomas* v. *Cox,* supra, 136.

The issue of agency, even in a constitutional context, is primarily a question of fact; see *Thomas* v. *Cox,* supra, 135; *State* v. *Brooks,* 38 Wash. App. 256, 261–62, 684 P.2d 1371 (1984); cf. *State* v. *Ostroski,* 186 Conn. 287, 292, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982); and ordinarily we defer to factual findings made by the trial court. When, however, a defendant raises a question of this nature that is vitally affected by trial court factfinding, in a setting in which the credibility of the witnesses is not the primary issue, our customary deference to the trial court is tempered "by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence. *State* v. *Frazier,* [185 Conn. 211, 219, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 1375 (1982)]." *State* v. *Harris,* 188 Conn. 574, 580, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983); cf. *State* v. *Ostroski,* supra, 291–92.

Examination of the record before us in this case reveals that there was substantial evidence for the trial court's conclusion that Papagolas was not acting as an agent of the state in his conversations with the defendant. Although the police may have supported and even encouraged Papagolas' efforts to obtain information

from the defendant, their involvement was not so extensive as to create an agency relationship.

The police did not seek out Papagolas and were not involved in his initial decision to visit the defendant. Rather, Officers John Jacewicz and John Rearick first encountered Papagolas by chance on March 14, 1979, as he was cleaning out the defendant's car. Papagolas informed the police that he was visiting the defendant at the defendant's request, had seen the defendant earlier that day and would be visiting him again. The three discussed the disappearance of Vern Cook and Papagolas agreed to contact the police if he heard anything about the victim. A similar conversation occurred at a meeting arranged by Papagolas on March 16, 1979. Without notifying the police, Papagolas again visited the defendant on March 19, 1979. He asked the defendant whether he had killed Cook and the defendant answered in the affirmative. At the time he elicited this confession, Papagolas had had only minimal contact with the police and it is clear that he was acting by himself and on his own initiative. The police had simply asked him to let them know if he heard anything; that request alone did not create an agency relationship. See *Thomas* v. *Cox,* supra, 137.

Following the confession, police involvement increased. After Papagolas left the jail, he called Jacewicz, told him what he had learned, and arranged a meeting. He also told the police that, at the defendant's request, he was planning to return to the jail for a visit later that day. The police, who had discovered that Papagolas did not have a driver's license, agreed to drive Papagolas to the jail. Rearick and Jacewicz transported Papagolas to the jail that evening and on two subsequent occasions. On each occasion the police waited for Papagolas outside the jail and, on the ride home, he told them what he had learned. His final visit

occurred on March 22, 1979, when the defendant revealed the location of the body.

The transportation service provided by the police is the strongest evidence of a possible agency relationship. In addition there was evidence indicating that, by the time of his final visit, Papagolas was motivated, at least in part, by a feeling of responsibility toward the police. There was also conflicting testimony about whether Rearick and Jacewicz ever asked Papagolas to go to the jail to get information as opposed to simply supporting his own decision to go there. Balanced against these factors, which tend to show police involvement, is the fact that the police neither initiated contact with Papagolas nor directed his activities. Papagolas had no previous affiliation with the police and was neither rewarded monetarily nor promised any favors in return for his cooperation.[4]

In sum, the record before us supports the trial court's conclusion that police involvement was not so extensive as to create an agency relationship between Papagolas and the police. The trial court was correct in its decision to admit the defendant's incriminating statements into evidence.

## II

The defendant challenges the validity of the grand jury indictment against him on two grounds: (1) the defendant's involuntary absence from the grand jury proceedings; and (2) the state's attorney's submission, to the grand jury, of a list of potential witnesses and their anticipated testimony. It is undisputed that the

---

[4] The defendant claims that Papagolas cooperated with the police because he hoped to be rewarded in a variety of ways, including not being fined for driving without a license, obtaining a recommendation to the Florida state police, and receiving a film projector. He points to no evidence, however, indicating that the police offered Papagolas any of these rewards in exchange for obtaining incriminating evidence from the defendant.

defendant, then incarcerated in connection with the pending arson charges, received no notice of the grand jury proceedings and was totally excluded from participating therein. It is equally uncontested that the state was permitted to present to the grand jury a list of witnesses that included detailed information about the connection of each potential witness with the crime. In the trial court, the defendant's unsuccessful motion to dismiss the indictment relied on these facts to raise constitutional claims of due process and of the right to confrontation. In this court, the defendant claims instead that the nature of the grand jury proceedings in this case violated the express and the implied requirements of the Practice Book. We find no error.

The state argues that the defendant's challenge to the grand jury proceedings is not properly before this court. We agree. The constitutional claims that the defendant raised at trial have not been briefed here, and are therefore deemed to have been abandoned. No other claims having been distinctly presented to the trial court, the defendant's present arguments will ordinarily not be considered on appeal unless they fall within the narrow exception of *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). Under *Evans,* newly raised claims that do not implicate newly discovered constitutional rights are entitled to appellate review only "where the record adequately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right and a fair trial." Id. The defendant's complaints about the grand jury proceedings that led to his indictment cannot meet this threshhold test. See *State* v. *Torrence,* 196 Conn. 430, 435, 493 A.2d 865 (1985).

The defendant's claim of error with regard to his exclusion from the grand jury proceedings turns on Practice Book § 609 (4), which, at the time of those pro-

ceedings, allowed a defendant to be present while a grand jury heard evidence "within the discretion of the judicial authority."[5] The present record does not demonstrate in what manner any judicial authority exercised the discretion contemplated by this provision of the Practice Book. In the absence of such a record, the defendant cannot show the deprivation of a fundamental constitutional right. See *State* v. *Couture,* 194 Conn. 530, 554, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985).

The defendant's claim of error with regard to the state's allegedly over-intrusive witness list is claimed to violate the accepted grand jury practice forbidding the state's attorney to question witnesses before the grand jury. *State* v. *Stepney,* 181 Conn. 268, 273, 435 A.2d 701 (1980), cert. denied, 449 U.S. 1077, 101 S. Ct. 856, 66 L. Ed. 2d 799 (1981); *State* v. *Menillo,* 159 Conn. 264, 274, 268 A.2d 667 (1970). The record before us fails, however, to establish how the use of such a list interfered with the independence of the grand jury. Cf. *State* v. *Couture,* supra, 555 n.11.

There is no error.

In this opinion the other judges concurred.

---

[5] Practice Book § 609 was repealed as of October 1, 1984.