STATE OF CONNECTICUT *v.* WILLIAM L. GORDON
(11679)
(12709)

PETERS, C. J., SHEA, DANNEHY, SANTANIELLO and CALLAHAN, Js.

414

Argued June 11—decision released September 10, 1985

*Suzanne Zitser* and *Jon C. Blue,* assistant public defenders, with whom, on the brief, were *Joette Katz* and *Eugene Riccio,* public defenders, for the appellant (defendant).

*Julia D. Dewey* and *Robert J. O'Brien,* assistant state's attorneys, with whom, on the brief, were *Arnold Markle,* state's attorney, and *Katherine Lambert,* former deputy assistant state's attorney, for the appellee (state).

SANTANIELLO, J. The defendant, William Leonard Gordon, was charged in a substitute information with first degree burglary; General Statutes § 53a-101 (a) (1); conspiracy to commit first degree burglary; General Statutes § 53a-48; first degree robbery; General Statutes § 53a-134 (a) (2); conspiracy to commit first degree robbery; General Statutes § 53a-48; first degree larceny; General Statutes § 53a-122 (a) (2); conspiracy to commit first degree larceny; General Statutes § 53a-48; second degree unlawful restraint; General Statutes § 53a-96 (a); and conspiracy to commit second degree unlawful restraint. General Statutes § 53a-48. He was convicted as charged by a jury, and was sentenced to a term of not less than eighteen nor more than forty years imprisonment. He appeals both from his conviction, and from the sentences imposed on the guilty ver-

dicts, raising five claims of error. One claim involving the denial of a pretrial motion for a continuance was also pursued simultaneously with this appeal, through a petition for a writ of habeas corpus, which the habeas court denied prior to oral argument before this court. As a general rule, this court will not consider a claim which is the subject of a collateral proceeding from which an appeal to this court is available. We therefore decline to review this claim. The remaining four claims, all properly before us, question (1) whether the defendant's attorney-client privilege was violated, (1A) whether the trial court erred in denying defense counsel's motion for a continuance until a key trial witness had become available to testify, (2) whether the trial court's treatment of defense counsel denied the defendant a fair trial, and (3) whether the trial court erred in computing the defendant's total effective sentence. We find no error.

## THE CRIME

On February 18, 1980, two masked, armed men entered the West Haven home of Stanley and Harriet Sikorsky. The intruders bound and gagged Mrs. Sikorsky, who was alone in the house except for her three children, who were asleep, and tied her to a chair with a piece of twine. They then removed from the home jewelry valued at approximately $130,000, a fur coat, a camera, and $5000 cash. The West Haven police investigated the crime, but initially had no leads.

On March 22, 1980, the Milford police arrested Gary White for possession of a weapon in a motor vehicle. A search of White's car incident to his arrest revealed items the police believed to be the tools of crime, including a ski mask, a pair of pliers, and a ball of twine. The discovery of these items prompted the Milford police to contact the West Haven police, who then came to

Milford to interview White concerning the Sikorsky robbery. During the course of the interview, White made inculpatory statements linking himself and the defendant to the crime. On the strength of these inculpatory statements, the police secured a warrant to search the defendant's home. During the execution of the warrant on March 26, 1980, the police seized several items, including a piece of twine, a police scanner, and a code book. The defendant, however, was not then arrested.

On May 2, 1980, the West Haven police arrested Robert Hundley in connection with the robbery. Hundley made several statements to the police implicating himself, White, and the defendant in the crime. On May 8, the police executed a warrant for the defendant's arrest.

### PRETRIAL PREPARATION

Following his arrest, the defendant retained Attorney Robert Mirto to represent him in the preliminary proceedings. In August, 1980, the defendant hired Attorney Robert Casale, who then became sole defense counsel in the case. From the time of his arrest until his subsequent conviction, the defendant took an extremely active role in the preparation of his defense. His wife, Janet Gordon, also assisted in the planning of defense strategy.

The extent and timing of Janet Gordon's involvement with the defendant and his counsel are crucial and disputed issues in this case. The following facts appear clear from the record: From the time of the defendant's arrest in May, 1980, until January 5, 1982, when she entered a federal witness protection program, Janet Gordon consistently supported her husband throughout all pretrial proceedings and in the preparation of his defense. Outwardly, she was stalwart in maintain-

ing her husband's innocence. She regularly accompanied the defendant on weekly, and often daily, visits to Casale's office, and was present during attorney-client discussions between the defendant and Casale. At home, she participated in three-way phone conversations with the defendant and Casale. More important, it appears that Janet Gordon was an active participant in the planning of defense strategy, including the decision of whether she or the defendant would take the stand, the discussion of which other witnesses might be helpful to the case and how these witnesses could be located, and the preparation of a list of alibi witnesses.

On November 30, 1981, a date crucial to the defendant's claims on appeal, Janet Gordon initiated a meeting with Detective James Harris of the West Haven police department at a restaurant in New Haven. At that meeting, she revealed to Harris that her husband had been involved in the Sikorsky robbery, and discussed with Harris the details of the crime. She claimed that the defendant had been threatening her, and that she was deeply afraid of him. Thereafter, Janet Gordon met on two more occasions with members of the police department and the state's attorney's office at the career criminal division in New Haven. At the first of these meetings, which occurred on December 3, 1981, she told the police the strategy the defendant had planned to use to discredit Gary White's statements, and that neither she nor the defendant nor their children would be taking the stand in the upcoming trial. She also expressed a desire to leave the defendant and she sought the state's aid in arranging her placement into a federal witness protection program. On December 14, 1981, the second meeting took place, during which federal marshals interviewed Janet Gordon in connection with her entrance into the witness protec-

tion program. It appears that she did not discuss the case with the police or the state's attorney at that time.

The state informed Janet Gordon, after its initial meeting with her on November 30, that she could not be placed immediately in a protection program and that she should return home and try to avoid any further involvement in the defendant's case. She was also told not to relate to the police or the state's attorney any information she had received concerning preparation of the defense. Janet Gordon did, however, continue to participate in meetings between the defendant and Casale after this time in order not to arouse suspicion that she had been in contact with the state.

On or about January 6, 1982, Janet Gordon and her three sons left their home and entered a witness protection program. The defendant and his counsel had no knowledge of Janet Gordon's involvement with the state prior to this time, and did not receive official notice of her decision to become a state's witness until March, 1982. On March 18, Casale, in anticipation of having to testify at a pretrial hearing involving Janet Gordon's conduct, withdrew as the defendant's counsel.

The defendant's trial was scheduled to begin on March 23. He appeared on that date without counsel and was given a one week continuance to find new counsel. On March 30, he again appeared without counsel, having had difficulty with the financial arrangements involved in retaining a private attorney. The court told the defendant to be back in court on April 13 with counsel and no excuses. The defendant appeared in court on April 13 having retained Attorney Charles Hanken to represent him. Hanken then requested a two to three week continuance, claiming he had not had sufficient time adequately to prepare for trial. The motion was denied, first by the court, *Fishman, J.,*

in pretrial proceedings, and again by the trial court, *Hadden, J.*, just prior to the start of jury selection. It is unclear from the record precisely when Hanken began to work on the case.

## THE TRIAL

Jury selection began on April 13, 1982. On April 19, the defendant filed a motion to dismiss the charges, based on what he claimed to be his wife's infiltration, as an informer for the state, into privileged communications between himself and his attorney. The trial court held an evidentiary hearing on the motion on April 22, and from April 27 through 29, during which Janet Gordon, Detective Harris, Attorneys Mirto and Casale, and State's Attorney Durham testified. The defendant attempted to show through these witnesses that Janet Gordon had become an agent of the state on November 30, 1981, that she thereafter had received information concerning defense strategy during privileged discussions between the defendant and his attorney, and that she had transmitted this information to the state. The trial court denied the motion, finding that Janet Gordon had voluntarily approached the state, that the state had specifically instructed her to avoid further contact with Casale, and that any information she passed on to the state she had received prior to initially contacting the state. The defendant duly excepted.

On April 27, 1982, defense counsel discovered that Gary White, scheduled to testify as a state's witness, had escaped from custody. Counsel moved for a continuance until White's apprehension, stating that White's testimony was crucial to the defendant's ability to receive a fair trial. The court denied the motion. On May 3, the state began presenting its case-in-chief. On May 20, while the state was still presenting its case,

defense counsel moved for a continuance on the basis of his discovery that Gary White had been apprehended in Louisiana. The trial court denied the motion.

On May 28, the jury found the defendant guilty as charged. He received a total effective sentence of eighteen to forty years imprisonment. The defendant thereupon filed a motion in the trial court to correct the sentence, pursuant to Practice Book § 935. The court denied the motion and the defendant amended the present appeal, pursuant to Practice Book § 3062, to include a review of this ruling.

I

The defendant's first claim is that the trial court erred in denying a motion to dismiss based upon his wife's continued participation in privileged discussions between the defendant and his attorney after November 30, 1981, the date he alleges she entered into an agency relationship with the state. The defendant characterizes Janet Gordon as a government informant who, after November 30, obtained and transmitted to the state confidential attorney-client communications in violation of his sixth amendment right to counsel and fourteenth amendment guarantee of a fair trial.[1]

In order to prevail on this claim of error, the defendant must first prove that Janet Gordon's relationship with the state was one of agency. This court recently enumerated, in *State* v. *Alexander,* 197 Conn. 180, 496 A.2d 486 (1985), the primary factors to be considered in determining when an otherwise private citizen has become an agent of the government. "The existence of an agency relationship . . . turns upon a number

---

[1] The defendant does not claim a violation of the marital privilege. That privilege, embodied in General Statutes § 54-84a, protects private communications between a husband and wife, and can be waived by the testifying spouse at any time. The defendant could not successfully claim this privilege since Janet Gordon voluntarily testified against him at trial.

of factual inquiries into the extent of police involvement with the informant. Those inquiries include the following: whether the police have promised the informant a reward for his cooperation or whether he is self-motivated; see *Thomas* v. *Cox,* [708 F.2d 132, 136 (4th. Cir.), cert. denied, 464 U.S. 918, 104 S. Ct. 284, 78 L. Ed. 2d 262 (1983)]; *Lightbourne* v. *State,* 438 So. 2d 380, 386 (Fla. 1983), cert. denied, 465 U.S. 1051, 104 S. Ct. 1330, 79 L. Ed. 2d 725 (1984); whether the police have asked the informant to obtain incriminating evidence and placed him in a position to receive it; see *United States* v. *Brown,* 466 F.2d 493, 495 (10th Cir. 1972); *People* v. *Odierno,* 121 Misc. 2d 330, 334, 467 N.Y.S.2d 968 (1983); and whether the information is secured as part of a government initiated, pre-existing plan. See *United States* v. *Panza,* 750 F.2d 1141, 1152 (2d Cir. 1984); *Thomas* v. *Cox,* supra, 136." *State* v. *Alexander,* supra, 184–85. We have reviewed the defendant's claim of agency in light of these factors. It is our conclusion that at no point in time did an agency relationship exist between Janet Gordon and the state.

We begin by noting that, significantly, it was Janet Gordon who initially approached the state and expressed the desire to reveal certain information concerning the defendant's involvement in the Sikorsky robbery. It appears that she contacted the state out of fear that she would be pressured by the defendant into committing perjury on the stand, and in order to obtain the protection of a federal witness program. The fact that the government did not specifically contact Gordon, while not determinative of the question of agency, clearly is of considerable importance to our analysis. See *Thomas* v. *Cox,* supra, 135.

Although the defendant asserts that Janet Gordon's relationship with the state involved an implied exchange of promises that she would obtain informa-

tion for the state and eventually testify against the defendant if the state would guarantee her and her children's placement in a witness protection program, there is simply no evidence in the record to support such an allegation. Unrefuted testimony given by Janet Gordon, Detective Harris, and State's Attorney Durham at the evidentiary hearing on this matter tended to show that the state had instructed Janet Gordon to try to avoid further contact with defense counsel and to keep private any information she received concerning the defendant's case. Although the state instructed Janet Gordon to remain at home until her placement in a protection program, approximately one month later, the defendant cannot point to any facts to support his veiled allegation that this was done for the purpose of infiltrating privileged conversations between the defendant and his attorney. In sum, there is no evidence in the record before us to support a finding of agency between Janet Gordon and the state. Consequently, the defendant's claim on this issue must fail.

The defendant has raised the additional and related argument that Janet Gordon became so intimately involved in the planning of defense strategy that she was bound to respect the same attorney-client confidentiality requirement as if she had been a legal associate of defense counsel. He contends that, under these circumstances, her disclosure to the state of privileged information she obtained either before or after November 30 violated the defendant's sixth amendment right to counsel.

"The basic principles of the attorney-client privilege are undisputed. Communications between client and attorney are privileged when made in confidence for the purpose of seeking legal advice. *Doyle* v. *Reeves*, 112 Conn. 521, 523, 152 A. 882 (1931); Tait & LaPlante, Handbook of Connecticut Evidence (1976) § 12.5. By

contrast, statements made in the presence of a third party are usually not privileged because there is then no reasonable expectation of confidentiality. *State* v. *Colton,* 174 Conn. 135, 138–39, 384 A.2d 343 (1977); McCormick, Evidence (2d Ed. 1972) § 91, p. 188." *State* v. *Cascone,* 195 Conn. 183, 186, 487 A.2d 186 (1985). The presence of certain third parties, however, who are agents or employees of an attorney or client, and who are necessary to the consultation, will not destroy the confidential nature of the communications. *State* v. *Cascone,* supra, 186–87 n.3.

The defendant's claim that Janet Gordon's status was analogous to that of a legal associate of defense counsel fails on the facts. Janet Gordon clearly was not an employee of Attorney Casale. She received no salary and had no other connection to him beyond her involvement with the defendant's case. Defense counsel did not initiate Janet Gordon's attendance at attorney-client conferences or directly seek her assistance in the development of defense strategy. It appears instead that it was the defendant who encouraged her involvement. We cannot conclude, therefore, that Gordon was constrained by the attorney-client privilege as if she had been a legal associate of defense counsel.

## IA

The defendant's second claim is that the trial court erred in denying his motion for a continuance until Gary. White, a proposed state's witness and escapee from custody, could be apprehended and returned to Connecticut, thus becoming available to testify. Prior to jury selection, on April 13, 1982, Gary White was listed as one of the state's proposed witnesses. At that time White was incarcerated. Subsequent thereto, on April 27, 1982, defense counsel discovered that White had escaped from custody. During the course of the trial, statements made by White, a confessed accom-

plice, were introduced into evidence as a result of defense counsel's examination of other witnesses. Upon ascertainment of the fact of White's escape and unavailability, defense counsel informed the court that he now desired the presence of the missing witness at the trial as an essential witness for impeachment purposes. A motion for mistrial was then filed, which was denied. During the discussion before the court on the motion for mistrial, the following discourse took place:

"Mr. Hanken: First I'm asking for a mistrial.

"The Court: Oh. Is that your second motion, for a continuance?

"Mr. Hanken: First let me finish with the first one. I don't know if Gary White will ever be found. I would like to ask for a reasonable continuance until Gary White is found, but who in God's name knows if he ever will be? Also, I have to consider I have a jury out. I don't even recall when we picked the first one, nor actually when we picked the last one, but it seems that they've been out for quite a long time.

"The Court: That's something that I have given some thought to, Mr. Hanken, but go ahead. Finish your argument on the motion for mistrial.

"Mr. Hanken: So I don't think we can realistically wait for Gary to be caught. I would, therefore, accordingly, move for a mistrial and, if and when Gary White is found, renew—well, not 'renew' but start a new trial.

"Mr. Fasano: I'm assuming at this point we're taking up the motion for mistrial. I haven't heard a thing that even remotely resembles the basis for a motion for mistrial.

"The Court: Neither have I. The motion for mistrial is denied."

At this time, defense counsel moved for a continuance of the case until White was apprehended, but the motion was denied by the court. Thereafter, while the state was completing the presentation of its case in chief, the state's attorney informed the court that White had been apprehended and was in the custody of the Shreveport, Louisiana police officials. He also informed the court that it "would not be the State's intention at this time, however, to wait for Gary White's return to complete its case in chief." Defense counsel then renewed his motion "to continue the case until Gary White comes back." This motion was denied. The record at this point was devoid of any information regarding "possible extradition proceedings," and there was no offer made to show a reasonable expectation of when, if at all, White might be returned to Connecticut.

The law is clear that requests for continuances are matters of judicial discretion and that on review every reasonable presumption in favor of the trial court's discretionary ruling will be made. *State v. McKnight,* 191 Conn. 564, 577, 469 A.2d 397 (1983); *State v. Bethea,* 167 Conn. 80, 84, 355 A.2d 6 (1974). The trial court's decision will be reversed only if it represents a gross abuse of discretion that substantially alters the defendant's chance for a fair trial. " ' "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process." ' " *State v. McKnight,* supra, 576; *State v. Bethea,* supra. Rather, the answer must be found in the particular facts of each individual case. *State v. McKnight,* supra. If the criminal defendant requests a continuance to await the return of an absent witness, he bears the burden of providing a good faith justification for such a continuance. In the instant matter, the state was close to concluding its case, the court had already denied a motion for mistrial and there was no representation

as to when, if ever, the missing witness might be expected to become available for testimony. In fact, there was no information on the witness' availability other than that he had been apprehended in Louisiana. There was no indication that White would waive extradition and thus become immediately available for trial. See, e.g., *Parks* v. *Bourbeau,* 193 Conn. 270, 477 A.2d 636 (1984). Extradition procedures can be extremely lengthy and complicated, and there is no guarantee that the extradition process will be successful. The record was devoid of any attempt to establish a reasonable expectation of when White might be available. Courts must vigilantly ensure that requests for continuances do not become mere vehicles for achieving delay, which, in turn, may obstruct the orderly procedure in the courts or interfere with the fair administration of justice. The court did not abuse its discretion, under these circumstances, in refusing to permit an indefinite or open-ended continuance.

Thus, the court's denial of the defendant's request for a continuance was appropriate and within its discretionary powers.

## II

The defendant next claims that he was deprived of his constitutional right to a fair trial as a result of the trial judge's treatment of defense counsel throughout the course of the proceedings. The defendant labels the court's treatment of defense counsel as "degrading and unjudicial" and contends that it materially impaired his counsel's ability adequately to present a defense. The state, on the other hand, argues that the trial judge's actions were a proper, albeit futile, attempt to control an unruly defense counsel, whose conduct it describes as "petulant, sarcastic, insulting, emotional, melodramatic, and . . . contemptuous."

"Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. U.S. Const., amend. XIV; Conn. Const., art. I, § 8; *Lisenba* v. *California,* 314 U.S. 219, 62 S. Ct. 280, 86 L. Ed. 166 [1941]; *Wojculewicz* v. *Cummings,* 145 Conn. 11, 19, 138 A.2d 512, cert. denied, 356 U.S. 969, 78 S. Ct. 1010, 2 L. Ed. 2d 1075 [1958]. In a criminal

trial, the judge is more than a mere moderator of the proceedings. It is his responsibility to have the trial conducted in a manner which approaches an 'atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding.' *Glasser* v. *United States,* 315 U.S. 60, 82, 62 S. Ct. 457, 86 L. Ed. 680 [1942]; *Quercia* v. *United States,* 289 U.S. 466, 469, 53 S. Ct. 698, 77 L. Ed. 1321 [1933]." *State* v. *Echols,* 170 Conn. 11, 13, 364 A.2d 225 (1975).

Our review of the transcript reveals that the trial judge was neither "cautious [nor] circumspect" in the manner in which he addressed defense counsel, and presided over the case. See *Cameron* v. *Cameron,* 187 Conn. 163, 169, 444 A.2d 915 (1982). The transcript, which encompasses well over three thousand pages, is replete with instances of argumentative conduct towards defense counsel. Although it appears from the record that the actions of defense counsel often provoked and irritated the court, accounting for much of the contention,[2] the court still has the responsibility of maintaining a calm demeanor and the decorum of the courtroom.

The defendant is entitled to a new trial in such circumstances, however, only where he can show that prejudice resulted from the court's actions. See *State* v. *Echols,* supra, 16. In the present case, the trial judge directed his disparaging comments solely at defense counsel. The judge took no position of advocacy regarding the outcome of the case, and made no improper

---

[2] "[Practice Book] Sec. 288. OBJECTIONS TO EVIDENCE

"Whenever an objection to the admission of evidence is made, counsel shall state the grounds upon which it is claimed or upon which objection is made, succinctly and in such form as he desires it to go upon the record, before any discussion or argument is had. Argument upon such objection shall not be made by either party unless the court requests it and, if made, must be brief and to the point. An exception to the ruling must be taken in order to make it a ground of appeal."

comments on the significance of the evidence presented. At no time did the judge convey to the jury his opinion as to the guilt or innocence of the defendant. The trial judge's actions, while questionable, do not appear to have thwarted defense counsel's ability to defend his client. Counsel zealously argued the numerous motions he presented, fully cross-examined all witnesses and was not constrained in his attempts to have evidence admitted, or in his ability to object to actions of the state's attorney. We conclude that because the trial court did not show any actual animosity towards the defendant on the merits of the case, the court's allegedly improper treatment of defense counsel did not deny the defendant a fair trial. See *State* v. *Gionfriddo,* 154 Conn. 90, 97, 221 A.2d 851 (1966).

## III

The defendant's final claim is that the trial court erred in computing the defendant's effective sentence. Following the defendant's conviction on the eight counts charged, the trial court imposed concurrent indeterminate sentences of ten to twenty years on the first four counts, concurrent indeterminate sentences of seven to twenty years on the fifth and sixth counts, and concurrent definite sentences of one year on the last two counts. The court ordered the two pairs of concurrent indeterminate sentences to run consecutive to each other, amounting to a total effective sentence on the first six counts of seventeen to forty years. The court then ordered the concurrent definite sentences of one year to run consecutive to the indeterminate sentence of seventeen to forty years, and that it be added to the minimum of the indeterminate sentence, thus giving the defendant a total sentence of eighteen to forty years. The trial court denied the defendant's motion to correct an illegal sentence. The defendant claims on appeal that the trial court erred in adding

the determinate sentence to the minimum, rather than to the maximum amount of the effective sentence.

To support his position the defendant relies on two statutes. He contends first that the language of General Statutes § 53a-37 authorizes a sentencing court to add a subsequent definite sentence to the maximum term imposed on a prior count. That statute provides in part: "When a person is sentenced for two or more counts each constituting a separate offense, the court may order that the term of imprisonment for the second and subsequent counts be for a fixed number of years each. The court in such cases shall not set any minimum term of imprisonment except under the first count, and the fixed number of years imposed for the second and subsequent counts shall be added to the maximum term imposed by the court on the first count." The defendant further claims that adding a subsequent determinate sentence to the minimum of an indeterminate sentence is contrary to General Statutes § 53a-35 (c) (2), which provides that the minimum term for a class B, C, or D felony shall not be "more than one-half of the maximum term imposed." Our interpretation of these statutes leads us to a different conclusion.

The latter portion of § 53a-37, upon which the defendant relies, provides the court with an alternate method of sentencing for crimes carrying indeterminate sentences. It operates in situations where the trial court imposes an indeterminate sentence on the first count, and where the additional counts require indeterminate sentences, but the court in its discretion, may set a fixed number of years for each second and subsequent count. In such a situation, the court does not set any minimum term of imprisonment except under the first count and the number of years imposed for the second and subsequent counts are added to the maximum imposed on the first count. In the present case the definite sen-

tences of one year were for misdemeanor violations, for which the trial court was required to impose a definite sentence not to exceed one year. The imposition of an indefinite sentence was not an option for the court under the provisions of § 53a-37.

Once a definite sentence is imposed, a defendant must serve the full amount of the sentence. Unlike indeterminate sentences, there is no discretion in the parole board to order early release from a definite sentence. Logically, it would make little sense to add a definite sentence to the maximum of an indeterminate sentence, because a defendant would need to serve only the minimum of the indeterminate sentence before he would be eligible for parole. In that situation, there could be no guarantee that the defendant would serve the definite sentence imposed. It is our conclusion, therefore, that where a sentencing court imposes on multiple counts an indeterminate sentence followed by a consecutive definite sentence, the mandatory definite sentence is to be served at the conclusion of the minimum term of the indeterminate sentence unless the court orders otherwise.

There is no error.

In this opinion the other judges concurred.