STATE OF CONNECTICUT *v.* WILLIAM BETTS
(SC 17994)

Norcott, Katz, Palmer, Vertefeuille and Schaller, Js.

Argued January 4—officially released March 18, 2008

*Carlos E. Candal*, special assistant public defender, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Gail Hardy*, state's attorney, and *Anne Mahoney*, senior assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. The dispositive issue in this appeal is whether the victim's mother was an agent of the police for purposes of the fourth amendment to the United States constitution,[1] and article first, § 7, of the state constitution,[2] when, after telling police officers about

---

[1] "The fourth amendment to the United States constitution provides: 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.' The fourth amendment has been made applicable to the states via the fourteenth amendment." *State* v. *Gonzalez*, 278 Conn. 341, 344 n.4, 898 A.2d 149 (2006).

[2] The constitution of Connecticut, article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

an incriminating letter authored by the defendant, she retrieved that letter at their request from the bedroom that she shared with him. The defendant, William Betts, appeals[3] from the judgment of conviction, rendered after a jury trial, of three counts of the crime of risk of injury to a child in violation of General Statutes § 53-21, and one count each of the crimes of sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1) (A), assault in the third degree in violation of General Statutes § 53a-61, unlawful restraint in the first degree in violation of General Statutes § 53a-95, and interfering with an emergency call in violation of General Statutes § 53a-183b. On appeal, the defendant claims, inter alia, that the trial court improperly denied his motion to suppress evidence of an incriminating letter that he had written to the victim because the police had seized it from his bedroom without his consent or a warrant. We affirm the judgment of the trial court.

The record reveals the following procedural history and relevant facts that the jury reasonably could have found. On February 29, 2004, A.L.,[4] the thirteen year old victim, visited the home of T.H., her mother, as she did typically once every other week. During that visit, A.L. and the defendant, who was T.H.'s fiancé, watched television together in the living room while T.H. slept in a downstairs bedroom that she shared with the defendant. A.L., who initially was sitting on the floor, then moved to lay down on the couch, at which time the defendant put his hand in her shirt and touched her breasts before moving his hand down to rub her "privates" with his right hand. A.L. told the defendant to

---

[3] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

stop touching her or else she would kick him, and then started to bang on the floor to wake T.H. The defendant stopped briefly, but then lay on top of A.L. and continued to touch her and grab her breasts with even more force.

At that time, T.H. entered the room, witnessed the defendant lying on top of A.L., and began to yell at both of them; T.H. then ran downstairs intending to call the police. Thereafter, an argument ensued between T.H. and the defendant, at which point he called A.L. into the room and asked her to say that nothing had happened between them. A.L. complied with the defendant's request and then left the room, at which point T.H. and the defendant started arguing again about who was lying. At that point, A.L., who had overheard the conversation, became angry, returned to the room and told the defendant to tell T.H. the truth. A.L. then told T.H. that the defendant had "rap[ed]" and "sexually harass[ed]" her.[5]

T.H. then went back down to the bedroom to call the police. The defendant followed her downstairs and began to choke, beat and spit on her. A.L. also tried to call the police, but was unable to do so because the telephone in the room was disconnected. The defendant then stopped choking T.H., and she left the bedroom.

---

[5] The February 29, 2004 incident was not the first time that the defendant had touched A.L. since she had started visiting T.H. in November, 2003. The defendant touched A.L.'s entire body on multiple occasions with his hands when T.H. was not around or was out of the room, and occasionally would touch her vagina with his hands and penis. A.L. testified that she did not tell T.H. about what had been going on because she was confused and scared about what to do.

There is contradictory evidence in the record about whether the defendant had actually penetrated A.L. with his penis on those occasions. She initially told the police that the defendant had penetrated her vagina, but then "changed her mind" and told them that the defendant only rubbed and touched her with his penis, without penetration, which was consistent with her testimony at trial.

At this time, A.L. gave T.H. a letter that the defendant had written expressing his sexual desire for A.L.[6] The defendant then took the letter and hid it in the bedroom that T.H. and the defendant shared before T.H. could read it.

Thereafter, the police arrived at the house, and T.H. then gave the letter to Robin Gibson, a Manchester police officer who had responded to her call for help.[7] Subsequently, the defendant was arrested and charged with numerous counts of risk of injury to a child, sexual assault in the third degree, assault in the third degree, unlawful restraint in the first degree and interfering with an emergency call.[8] After hearing the trial testimony

[6] A.L. testified that the defendant had written her other letters since she started visiting T.H. in November, 2003, but also that he would tear most of them up and throw them away in her presence. With the exception of the letter at issue in this case, A.L. herself threw away the letters that the defendant had let her keep. She testified that the defendant wrote in the letters about how he wanted to teach her about sex and "kidnap me and take me somewhere so he could be my . . . husband, and how he wants to do a lot of crap to me that I told him I didn't want to do." A.L. did not tell anyone about these letters because she was afraid of the defendant and was afraid that, if the letters were revealed, she no longer would be able to see her mother. Moreover, N.L., who is A.L.'s father, testified that he did not recognize the handwriting on the letter as belonging either to his late father or to his nephew, both of whom were alleged to have molested her at other points as well.

[7] A.L. subsequently went to the hospital, where she was evaluated by Michelle Leon, an emergency room physician. The evaluation revealed no evidence of penetration or external or internal injuries, although A.L. complained of breast soreness and tenderness upon examination.

[8] Specifically, the state charged the defendant in a nine count information with: (1) risk of injury to a child in violation of § 53-21 (a) (1) with respect to acts having occurred between November 1, 2003 and March 1, 2004; (2) one count of risk of injury to a child in violation of § 53-21 (a) (2) with respect to acts having occurred between November 1, 2003 and February 28, 2004; (3) one count of attempted sexual assault in the first degree in violation of General Statutes §§ 53a-49 and 53a-70 (a) (1) with respect to acts occurring on or about February 25 and February 29, 2004; (4) one count of risk of injury to a child in violation of § 53-21 (a) (2) with respect to acts having occurred on or about February 25 and February 29, 2004; (5) sexual assault in the third degree in violation of § 53a-72a (a) (1) (A) with respect to acts having occurred on or about February 29, 2004; (6) risk of injury to

of A.L., T.H. and Gibson, the trial court denied the defendant's motion to suppress the letter from him to A.L. Thereafter, the trial court rendered a judgment of conviction in accordance with the jury's verdict of guilty on all counts of the information except for three and four. See footnote 8 of this opinion. The trial court sentenced the defendant to a total effective sentence of forty-three years imprisonment, suspended after twenty-three years, followed by thirty-five years of probation. This appeal followed.

On appeal, the defendant claims that the trial court improperly denied his motion to suppress the letter that he had written to A.L. expressing his sexual desire for her.[9] The defendant argues that the trial court improperly determined that T.H. was not an agent of the police when she went to the bedroom that she shared with the defendant and retrieved the letter for them. The defendant contends that the actions of the police, through T.H., constituted a search and seizure that violated the federal and state constitutions because it was performed without his consent or a warrant. The state argues in response that the trial court's decision is supported by substantial evidence in the record, and also

a child in violation of § 53-21 (a) (2) with respect to acts having occurred on or about February 29, 2004; (7) assault in the third degree in violation of § 53a-61 with respect to acts having occurred on or about February 29, 2004; (8) unlawful restraint in the first degree in violation of § 53a-95 with respect to acts having occurred on or about February 29, 2004; and (9) interfering with an emergency call in violation of § 53a-183b with respect to acts having occurred on or about February 29, 2004.

[9] The letter, as written by the defendant to A.L. and admitted to the jury, provided: "There was a reason for me to ask you all of them. I really thought you would be truthful about what happened the night you said you was out cold. I think you know what happened that night but don't want to admit it. And now the true reason I kept asking you about sex is that I would to eat you out and make you have an organise. This is something I know you would like, and if that happens, mayb I can teach you a lot of things you would need to know about sex. But please don't take this the wrong way. But at least think about it and get back to me. I am not asking you to wrong, but just think about it."

contends that the admission of the letter was proper under the inevitable discovery doctrine.[10] We conclude that T.H.'s search of the bedroom did not implicate federal or state constitutional protections because the trial court properly determined that she was not an agent of the police when she retrieved the letter.

The record reveals the following additional relevant facts, which were articulated by the trial court in response to the defendant's motion for articulation pursuant to Practice Book §§ 64-1 and 66-5. The trial court found that it was undisputed that the letter belonged to A.L., who had turned it over to T.H. Noting that the jury had convicted the defendant of assault, the trial court then stated that he then took the letter from T.H. by force and "hid it in the marital bedroom." The trial court then stated that T.H. searched for the letter and found it between the mattresses in the bedroom, after which she took it and turned it over to Gibson.[11] The trial court then reiterated its decision, made at trial, that, "under the totality of [the] circumstances . . . [T.H.] was acting as a private agent and . . . any government action was merely incidental and not instrumental in the search and seizure of the letter."

The trial court acknowledged that T.H. had testified during cross-examination that Gibson had instructed her to " 'go into the bedroom and see if I can find [the

---

[10] In the alternative, the state argues that, even if the admission of the letter was improper, it nevertheless was harmless error.

[11] Gibson testified that she responded with two other officers to T.H.'s call for help shortly before 3 a.m. on February 29, 2004. A.L. told Gibson about the letter, and Gibson asked T.H. whether she knew where it was. T.H. then went into another room to retrieve the letter for Gibson, and brought it back to her. Gibson did not see exactly where T.H. got the letter from, although she believed it was the bedroom, where Gibson never went. A.L. also told Gibson that the defendant tried to take the letter away when she gave it to T.H.

letter], and I found it,' "[12] but found that this statement was not inconsistent "with the conclusion she was acting on her own" because it was T.H. and A.L. who brought up "the letter's existence [and] importance, and [T.H.], not the police, searches and seizes it and gives it to the police without any further requests." The trial court further noted that the police had not coerced or supervised T.H.'s conduct in any way, and credited Gibson's testimony that T.H. had acted on her own because she and A.L. wanted the police to know about the letter from the defendant.[13]

Our review of the trial court's determination about whether a private individual acted as an agent of the police, despite its "constitutional context, is primarily a question of fact . . . and ordinarily we defer to factual findings made by the trial court. When, however, a defendant raises a question of this nature that is vitally affected by trial court factfinding, in a setting in which the credibility of the witnesses is not the primary issue, our customary deference to the trial court is tempered by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence."[14] (Citations omit-

---

[12] T.H. testified that she retrieved the letter from between the bed and the mattress. She recognized the handwriting as belonging to the defendant. The defendant did not tell T.H. where he put the letter after he snatched it from her. T.H. also testified that Gibson had told her to go into the bedroom and look for the letter.

[13] The trial court noted further: "If anything that night, the police became the agents of [A.L.] and [T.H.] in proving their case against the defendant, not at the police's discretion or solicitation. To conclude otherwise would mean every victim who willingly and voluntarily assists the police is an agent of the police. There has to be a showing of some unconstitutional coercion, instigation or use of duress by the police to show they acted as agents of the police."

[14] In this court's most recent decision addressing agency issues in a search and seizure case, we stated: "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they

ted; internal quotation marks omitted.) *State* v. *Alexander*, 197 Conn. 180, 185, 496 A.2d 486 (1985); accord *State* v. *Swinton*, 268 Conn. 781, 855, 847 A.2d 921 (2004) (same inquiry and standard of review in sixth amendment context).

"As we have noted, a wrongful search or seizure conducted by a private party does not violate the [f]ourth [a]mendment and . . . such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully. . . . A private citizen's actions may be considered state action, however, if he acts as an instrument or agent of the state. . . . Although there is no bright line test for determining when a private citizen is acting as an agent of the police, we have stated that the existence of an agency relationship . . . turns upon a number of factual inquiries into the extent of police involvement with the informant. Those inquiries include the following: whether the police have promised the informant a reward for his cooperation or whether he is self-motivated . . . whether the police have asked the informant to obtain incriminating evidence and placed him in a position to receive it . . . and whether the information is secured as part of a government initiated, preexisting plan." (Citations omitted; internal quotation marks omitted.) *State* v. *Lasaga*, 269 Conn. 454, 463–64, 848 A.2d 1149 (2004), citing, e.g., *Coolidge* v. *New Hampshire*, 403 U.S. 443, 487, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971); *State* v. *Alexander*, supra, 197 Conn. 184–85.

---

are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . None of the trial court's factual findings is in dispute. Because these issues raise questions of law, our review is plenary." (Citation omitted; internal quotation marks omitted.) *State* v. *Lasaga*, 269 Conn. 454, 463, 848 A.2d 1149 (2004). Nevertheless, in considering the specific agency issues presented in *Lasaga*, in which a computer technician had turned over to the police child pornography that he had found on the defendant's computer, we concluded that the trial court's decision was supported by "substantial evidence." Id., 466–67.

This well established inquiry is consistent with Professor Wayne R. LaFave's observation that, "[when] police have been called to the scene and are thus present while a private person retrieves evidence of a crime which he had uncovered before contacting the police, and the private person's authority to make the search is not obviously nonexistent, courts do not appear to be concerned about the failure of the police to prevent the search." 1 W. LaFave, Search and Seizure (4th Ed. 2004) § 1.8 (b), p. 266. This is particularly so when the search serves some private purpose. Id., p. 267; see *Coolidge* v. *New Hampshire*, supra, 403 U.S. 487–88 (defendant's wife was not instrument of police when she volunteered to turn over his guns and clothing because forces encouraging cooperation with police include "the simple but often powerful convention of openness and honesty, the fear that secretive behavior will intensify suspicion, and uncertainty as to what course is most likely to be helpful to the absent spouse"); *United States* v. *Kinney*, 953 F.2d 863, 865–66 (4th Cir.) (presence of police in room did not turn defendant's girlfriend, who had summoned them, into agent of law enforcement when she entered his closet and produced guns kept therein when District Court had made "explicit factual finding that [the girlfriend] acted on her own initiative, without suggestion from the police officers, when she opened the closet door"), cert. denied, 504 U.S. 989, 112 S. Ct. 2976, 119 L. Ed. 2d 595 (1992); *Rawlings* v. *State*, 740 P.2d 153, 160–61 (Okla. Crim. App. 1987) (defendant's mother not agent of police because she had initiated police contact and delivered his belongings as police were not aware that crime had been committed until she informed them that she believed defendant had killed his former wife); *State* v. *Brockman*, 339 S.C. 57, 66–67, 528 S.E.2d 661 (defendant's mother not agent of police when she had summoned them for domestic disturbance and then offered

to go to basement to get drugs and gun that were locked in defendant's moped), cert. denied, 530 U.S. 1281, 120 S. Ct. 2757, 147 L. Ed. 2d 1018 (2000).[15]

Indeed, this court's leading case on agency issues in the context of criminal procedure, *State* v. *Alexander*, supra, 197 Conn. 180, illustrates how extensive police contact with a private citizen may be without creating an agency relationship. While awaiting trial on separate arson charges, the defendant in that case was "visited on several occasions by James Papagolas, who had befriended both the defendant and the victim," and "the defendant acknowledged to Papagolas that he had killed the victim," whose body was still missing at that time. Id., 182. Papagolas immediately informed the police about his conversation with the defendant, and the police subsequently drove Papagolas to the correctional center on three subsequent occasions and waited for him there, "[i]n part because [his] driver's license had been suspended and his car was out of order . . . ." Id. On one of those subsequent visits, the defendant told Papagolas where he had buried the victim's

---

[15] See also *State* v. *Gordon*, 197 Conn. 413, 422, 504 A.2d 1020 (1985) (defendant's wife was not agent of police because she "initially approached the state and expressed the desire to reveal certain information concerning the defendant's involvement in the . . . robbery . . . out of fear that she would be pressured by the defendant into committing perjury on the stand" and there was no evidence of agreement to exchange information for witness protection); *State* v. *Smith*, 40 Conn. App. 789, 803, 673 A.2d 1149 (private investigators not agents of state in arson case because no evidence "that the state coerced, encouraged, suggested or initiated the cause and origin inspections performed by the private insurance investigators" or that "government exercised any degree of control over the private insurance investigators when they conducted their inspections"), cert. denied, 237 Conn. 915, 675 A.2d 886, cert. denied, 519 U.S. 873, 117 S. Ct. 191, 136 L. Ed. 2d 128 (1996); *State* v. *Lee*, 32 Conn. App. 84, 93, 628 A.2d 1318 (repossession agent who found narcotics while inventorying contents of defendant's car was not instrument of police because officer standing by "did not participate or assist him in any way during the inventorying of the defendant's automobile"), cert. denied, 227 Conn. 924, 632 A.2d 702 (1993), cert. denied, 510 U.S. 1202, 114 S. Ct. 1319, 127 L. Ed. 2d 668 (1994).

body, and Papagolas thereafter led the police to the wooded area where they found the body. Id.

We concluded that the trial court properly denied the defendant's motion to suppress Papagolas' testimony about the defendant's incriminatory statements because the police had not violated the defendant's constitutional rights under the fifth and sixth amendments to the United States constitution by questioning him without *Miranda*[16] warnings, or in the absence of his counsel. Id., 182–83. The court emphasized that the "police did not seek out Papagolas and were not involved in his initial decision to visit the defendant," although it noted that they had discussed with Papagolas his plans to visit the defendant again, as well as the disappearance of the victim, and Papagolas' agreement to advise them "if he heard anything about the victim." Id., 186. The court noted that, "[t]he transportation service provided by the police is the strongest evidence of a possible agency relationship," as well as whether Papagolas had been "motivated, at least in part, by a feeling of responsibility toward the police." Id., 187. The court also cited the "conflicting testimony about whether [the police] ever asked Papagolas to go to the jail to get information as opposed to simply supporting his own decision to go there." Id. Nevertheless, the court emphasized that the police neither initiated contact with Papagolas nor directed his activities, and that he "had no previous affiliation with the police and was neither rewarded monetarily nor promised any favors in return for his cooperation." Id. The court ultimately concluded that Papagolas' relationship with the police was "not so extensive as to create an agency relationship"; id., 186; and, therefore, that "there was substantial evidence for the trial court's conclusion that [he] was not acting as an agent of the state in his conversa-

---

[16] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

tions with the defendant." Id., 185; see also *State* v. *Lasaga*, supra, 269 Conn. 466–67 (computer technician who discovered and reported defendant's downloading of child pornography was not agent of police even though he continued to monitor defendant and supply information after his original report).[17]

Even if we view the facts of the present case in the light most favorable to the defendant, and assume that Gibson asked T.H. to go into the bedroom to look for the letter after A.L. told Gibson about its existence, our analyses in *Alexander* and *Lasaga* require us to

[17] Our more recent decision in *State* v. *Lasaga*, supra, 269 Conn. 454, is similarly illustrative of how extensive contacts between law enforcement and a third party may be, and yet still not require a finding of agency. In *Lasaga*, a computer technician, upon learning from a college student that the defendant, a professor, had been downloading child pornography onto his office computer, monitored his computer activity for more than one week prior to meeting with law enforcement officials. Id., 457–58. At that time, the technician provided the police with "hard copies of computer logs detailing the defendant's computer activities and a compact disc that contained copies of images that the defendant had down loaded to a computer in the geology department." Id., 458. After the technician met with the university police, he continued to monitor the defendant's computer activity and subsequently delivered to them additional materials, although all of the materials provided "had been obtained by monitoring the defendant's computer activity prior to the initial . . . meeting." Id., 458–59. Thereafter, the Federal Bureau of Investigation (FBI) became involved, and the technician informed the agent who called him that the defendant was continuing to download child pornography. Id., 459.

We affirmed the trial court's finding that the technician "was in no way acting as an agent of the government in obtaining the information and material which was utilized by [the FBI agent] in drafting the search warrant." (Internal quotation marks omitted.) Id., 466. We emphasized that the "police did not seek out [the technician] and were not involved in his decision to obtain information regarding the defendant." Id. We noted that the technician had "no previous affiliation with the police and was not rewarded monetarily or promised any favors in return for his cooperation. Although there was conflicting testimony regarding whether the police had asked [the technician] to continue to provide them with more information or whether [he] had decided independently to continue monitoring the defendant's computer activities, the record before us, in sum . . . supports the trial court's conclusion that police involvement was not so extensive as to have created an agency relationship between [the technician] and the police." Id., 466–67.

conclude that there was substantial evidence to support the trial court's conclusion that T.H. was not an agent of the police. Indeed, this court upheld findings that there was no agency relationship in those cases, which presented far more extensive entanglements between the police and the private citizens than does this matter. In this case, the police did not place T.H. in a position to find or receive the incriminating letter. She already had received it from A.L., before the defendant took it from her and hid it in their bedroom. Finally, there was no government initiated, preexisting plan in this case, as Gibson learned about the existence of the letter from her conversation with A.L., and then asked T.H. whether she could find it. Moreover, there is no evidence that the police offered T.H. any kind of reward in this case, and T.H.'s initial contact with the police clearly was self-motivated, as she had to struggle with the defendant to reach a working telephone to call for help. We conclude, therefore, that substantial evidence supports the trial court's determination that T.H. was not an agent of the police, and therefore, her actions did not constitute a police search.[18] See, e.g., *Coolidge* v. *New Hampshire*, supra, 403 U.S. 487 ("[t]he question presented here is whether the conduct of the police officers at the [defendant's] house was such as to make [the] actions [of the defendant's wife] their actions for purposes of the [f]ourth and [f]ourteenth [a]mendments and their attendant exclusionary rules"). Accordingly,

---

[18] As there is no claim of any other police search having taken place in this case, we need not reach the defendant's remaining claim on appeal, which questions T.H.'s authority, under article first, § 7, of the Connecticut constitution, to consent to the police search of the bedroom that they had shared. See, e.g., *State* v. *Alexander*, supra, 197 Conn. 183 n.2 ("[o]ur disposition of this threshold issue [of agency] obviates the necessity of considering other possible impediments to the defendant's constitutional claims under either the fifth amendment . . . or the sixth amendment" [citations omitted]); *State* v. *Brockman*, supra, 339 S.C. 68 ("[h]aving found the search was private, we need not determine whether [the] [d]efendant had a legitimate expectation of privacy in his moped").

we also conclude that the trial court properly denied the defendant's motion to suppress the letter.

The judgment is affirmed.

In this opinion the other justices concurred.