## STATE OF CONNECTICUT *v.* ANTONIO C. LASAGA
### (SC 16707)

Sullivan, C. J., and Norcott, Katz, Palmer and Vertefeuille, Js.

Argued October 20, 2003—officially released June 1, 2004

*Diane Polan*, with whom, on the brief, was *Mary Ann Royle*, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*,

state's attorney, and *David J. Strollo*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, C. J. The defendant, Antonio C. Lasaga, was convicted, following a plea of nolo contendere, of two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2),[1] two counts of promoting a minor in an obscene performance in violation of General Statutes § 53a-196a (1),[2] and two counts of risk of injury to a child in violation of General Statutes § 53-21 (2).[3] The defendant appeals from the judgment of conviction claiming that the trial court: (1) improperly denied his motion to suppress evidence seized during a search of his home; and (2) abused its discretion in denying his motion for a continuance to obtain new counsel. We affirm the judgment of the trial court.

The record reveals the following relevant facts. The defendant was employed by Yale University as a profes-

---

[1] General Statutes § 53a-70 provides in relevant part: "(a) A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ."

[2] General Statutes § 53a-196a provides in relevant part: "(a) A person is guilty of employing a minor in an obscene performance when (1) he employs any minor, whether or not such minor receives any consideration, for the purpose of promoting any material or performance which is obscene as to minors, notwithstanding that such material or performance is intended for an adult audience . . . ."

[3] General Statutes § 53-21 provides in relevant part: "(a) Any person who . . . (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of . . . a class B felony . . . ."

Although § 53-21 has been amended since 1992 when the crimes here were first committed, the amendments are not relevant to this appeal. References to § 53-21 in this opinion are to the current revision of the statute.

sor of geology and geophysics. He was also the master of Saybrook College, one of Yale's residential colleges, and resided in the Saybrook College Master's House. On October 23, 1998, Victor Sletten, a Yale graduate student, informed Paul Gluhosky, a Yale employee responsible for ensuring that the geology department computers were functioning properly, that another student, Ian McGuinness, had notified Sletten that the defendant had downloaded child pornography onto his geology department office computer, referred to as "the sandbox computer."[4] Consequently, Sletten decided to monitor the defendant's download activity.

Later that day, Gluhosky accessed, from his own office computer, the files that the defendant had downloaded.[5] Gluhosky also developed a "monitoring script" that notified him by e-mail whenever the defendant placed new files into the directory in which he had saved the previous images. On the day that Gluhosky implemented it, the monitoring script e-mailed notification to him that the defendant had downloaded new files into that directory. Gluhosky then attempted to confirm that the defendant was in his office. Gluhosky did not see the defendant in his office because the defendant's office door was closed, but a student informed Gluhosky that he was in fact there. Gluhosky later viewed the images that had been downloaded and confirmed that they contained child pornography.

---

[4] Gluhosky stated that the defendant's geology department computer had a network address of "sandbox.geology.yale.edu." For clarity, we refer to this computer as "the sandbox computer."

[5] The geology department computers were networked in a system that provided computer access to anyone who entered an authorized password. Gluhosky testified, however, at the suppression hearing, that Yale's academic environment was free and open, and that persons utilizing Yale's computer system could view the majority of most users' files. Although some files, including e-mailboxes, could not be viewed by others on the system, most other files were accessible by any network users. Files could be stored privately by "read protecting" them.

From October 23 through October 30, 1998, Gluhosky continued to monitor when the defendant downloaded new material into the file directory in which the other images had been discovered. On October 30, Gluhosky notified his direct supervisor, Professor Ron Smith, that he believed the defendant was downloading child pornography. Smith instructed him to continue monitoring the defendant's computer activity. On November 2, Gluhosky and Smith met again and decided to contact Yale legal counsel, who referred Smith to Russell Kozak, a lieutenant with the Yale University police department, and Daniel Rainville, a detective with the Yale University police department. Smith informed the officers of what Gluhosky had told him regarding the defendant's computer activity. On November 3, Gluhosky met Kozak and Rainville at the Yale police department and told them that he believed that the defendant had used his computer to acquire child pornography. He provided them with hard copies of computer logs detailing the defendant's computer activities and a compact disc that contained copies of images that the defendant had down-loaded to a computer in the geology department. Gluhosky explained that the file transfer protocol log indicated that the defendant was transferring his downloaded files from the geology department computer to his master's residence computer. Kozak and Rainville waited until their meeting with Gluhosky concluded to examine the materials that he had provided. After meeting with Kozak and Rainville, Gluhosky continued to monitor the defendant's computer activity.[6] Subse-

---

[6] There was conflicting testimony at the suppression hearing regarding whether Kozak or Rainville instructed Gluhosky to discontinue his monitoring of the defendant's download activity. Gluhosky stated that at the end of his meeting with Kozak and Rainville on November 3, he was not instructed to continue or to discontinue monitoring the defendant's downloads. Gluhosky also testified, however, that at the end of his meeting with Kozak and Rainville on November 5, Kozak told him to let them know if the defendant downloaded more material, but that Rainville interrupted immediately and told Gluhosky, "No, don't let us know that, just, you know, don't do anything." Kozak testified that, during his November 3 meeting with

quent to his initial meeting with Kozak and Rainville on November 3, Gluhosky delivered to them additional materials including log sheets and a second compact disc. All of the materials that he provided to them, however, had been obtained by monitoring the defendant's computer activity prior to the initial November 3 meeting.

On November 3, 1998, Lisa Tutty, an agent of the Federal Bureau of Investigation (FBI), met with Kozak and Rainville at the Yale police department. Tutty reviewed and copied the materials, including the logs, compact discs, and printouts of the images that were on the disc that Gluhosky had provided to Kozak and Rainville. At the end of the meeting, Tutty instructed the Yale police department not to do anything further until she talked to someone in the United States attorney's office. On November 4, Tutty telephoned Gluhosky and they discussed the same information that she had discussed with Kozak and Rainville. During the conversation, Gluhosky informed Tutty that the defendant had downloaded more child pornography that afternoon.

On November 5, 1998, Tutty filed an affidavit in support of an application for "a warrant to search the premises known as 90 High Street, New Haven, Connecticut, also known as the residential quarters of the Master of Saybrook College and attached office . . . and to seize fruits, instrumentalities and evidence of and concerning violations of title 18 of the United States Code, § 2252A (a) (5) . . . ."[7] That same day, United States Magistrate Judge William I. Garfinkel signed a search warrant authorizing the search of "[t]he prem-

Gluhosky, he instructed Gluhosky to discontinue monitoring the defendant's downloads. Rainville testified, however, that there were no further instructions, and his police report did not indicate that Gluhosky had been instructed to continue or discontinue his monitoring.

[7] For the text of § 2252A (a) (5), see footnote 13 of this opinion.

ises known as the residential quarters and office for the Master of Saybrook College, Yale University, located at 90 High Street, New Haven, Connecticut as depicted below."[8]

On November 6, 1998, Tutty and eight to ten other law enforcement personnel arrived at the Saybrook College Master's House at 90 High Street to execute the search warrant. Because the defendant did not respond to repeated requests, telephone calls, and doorbell rings, the agents forced their way in through the front door. As they entered the first floor of the residence, they encountered the defendant, who was descending the stairs. Tutty informed the defendant that they had a search warrant for the premises and interviewed him while other law enforcement members searched the premises. During the interview, the defendant admitted to Tutty that there was child pornography upstairs and led the agents to his computer in room 218. During the search, the agents seized the defendant's computer, zip drives, floppy discs, compact discs, and other items, including two noncommercial, homemade videotapes. Most of the items seized in the search were found in the areas labeled "K" and "L" on a floor plan of the residence.[9]

On December 19, 1998, on the basis of the evidence recorded on the seized videotapes, the defendant was arrested pursuant to a state of Connecticut arrest warrant and charged with two counts of sexual assault in the first degree, two counts of promoting a minor in an obscene performance, and two counts of risk of injury to a child. The defendant pleaded not guilty and filed a motion to suppress the evidence seized during

---

[8] Depicted below was a small photograph of the outside of the front door of the Saybrook College Master's House.

[9] It is unclear from the record exactly when and from whom the searching agents received a copy of the floor plan that they used to label the rooms and areas searched.

the November 6, 1998 search. He claimed that the search exceeded the scope of the warrant, the affidavit did not establish probable cause, the allegations contained in the affidavit "were either knowingly untrue when made or made with a reckless disregard for the truth of such allegations," the search was conducted pursuant to an unconstitutional statute, and the search otherwise violated his federal and state constitutional rights. The defendant's case remained on the state trial list for almost three years because of unresolved legal issues in his federal case. In October, 2001, the presiding judge in the state proceeding informed the defendant that, unless a plea agreement was reached, the case would be scheduled for trial within the next two months. Both the hearing on the motion to suppress and the trial were scheduled to start in December, 2001.

At some point before the hearing on the motion to suppress, the defendant and his attorney disagreed about legal strategy and the defendant sought a new attorney. Two days before the suppression hearing was scheduled to begin, the defendant informed his original attorney that a New York law firm had agreed to represent him if the case could be continued until mid-January to give new counsel time to prepare for the suppression hearing. When the suppression hearing began on December 12, 2001, the trial court denied the defendant's continuance request. The defendant was represented by his original attorney throughout the suppression hearing.

On January 2, 2002, the court denied the defendant's motion to suppress. The trial court ruled: (1) Gluhosky was not acting as an agent of the police; (2) the defendant did not have a reasonable expectation of privacy in the files that he had downloaded to the Yale geology department computer; (3) the information in the warrant affidavit supported a finding of probable cause, even if the court disregarded the disk that Gluhosky

did not view before turning it over to the police; and (4) the search of areas K and L did not exceed the scope of the area authorized by the search warrant.

When jury selection began on January 4, 2002, the defendant changed his plea and entered pleas of nolo contendere to two counts of sexual assault in the first degree, two counts of promoting a minor in an obscene performance, and two counts of risk of injury to a child, but reserved, pursuant to General Statutes § 54-94a,[10] the right to appeal the denial of his motion to suppress. On February 15, 2002, the defendant was sentenced to a total effective sentence of twenty years imprisonment, followed by ten years of special parole. This appeal followed.

On appeal, the defendant claims that the trial court improperly determined that: (1) the police did not conduct a warrantless search; (2) the defendant did not have a reasonable expectation of privacy in his workplace computer; (3) Gluhosky was not acting as an agent of the police; and (4) the search did not exceed the scope of the warrant. In addition, the defendant claims that the warrant was issued on the basis of an unconstitutional statute and that the trial court improperly denied his request for a continuance to change counsel.

---

[10] General Statutes § 54-94a provides: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law provided a trial court has determined that a ruling on such motion to suppress or motion to dismiss would be dispositive of the case. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution."

## I

We first address the defendant's claims pertaining to the motion to suppress. "At the outset, we set forth the standard of review. Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Luurtsema*, 262 Conn. 179, 184, 811 A.2d 223 (2002). None of the trial court's factual findings is in dispute. Because these issues raise questions of law, our review is plenary. Id., 185.

## A

The defendant first claims that the trial court improperly denied his motion to suppress the videotapes that formed the basis for the charges against him because the police knew of or acquiesced to Gluhosky's continued monitoring of the defendant's computer use after meeting him on November 3, 1998. Therefore, he claims, Gluhosky was acting as an agent of the police when he provided the police with information subsequent to their initial meeting, including his statement to Agent Tutty that the defendant was downloading child pornography on November 4, 1998. Without this information, he argues, the search warrant affidavit would not have supported a probable cause finding. We disagree.

As we have noted, "a wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and . . . such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully." *Walter* v. *United States*,

447 U.S. 649, 656, 100 S. Ct. 2395, 65 L. Ed. 2d 410 (1980). A private citizen's actions may be considered state action, however, if he acts as an instrument or agent of the state. See *Coolidge* v. *New Hampshire*, 403 U.S. 443, 487, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971). Although there is no bright line test for determining when a private citizen is acting as an agent of the police, we have stated that the "existence of an agency relationship . . . turns upon a number of factual inquiries into the extent of police involvement with the informant. Those inquiries include the following: whether the police have promised the informant a reward for his cooperation or whether he is self-motivated . . . whether the police have asked the informant to obtain incriminating evidence and placed him in a position to receive it . . . and whether the information is secured as part of a government initiated, pre-existing plan." (Citations omitted.) *State* v. *Alexander*, 197 Conn. 180, 184–85, 496 A.2d 486 (1985); State v. Swinton, 268 Conn. 781, 855–56, 847 A.2d 921 (2004).

In *Alexander*, we concluded that "[a]lthough the police may have supported, and even encouraged [a private citizen's] efforts to obtain information from the defendant, their involvement was not so extensive as to create an agency relationship." Id., 185–86. There, "[t]he victim, Vern Alan Cook, and the defendant [Wayne Alexander] were scheduled to appear in court . . . in January of 1979 to answer to criminal charges of larceny in the third degree. In the early morning of the date [of the defendants' hearing] the courthouse was seriously damaged by fire, and their court appearances were continued to February 6, 1979. On February 5, 1979, the victim made arrangements with his mother for a ride to court on the following day, but he failed to meet his mother as planned, and never appeared in court." Id., 181. On March 9, 1979, the defendant admitted to the police that he had set the courthouse fire.

He implicated the victim as his accomplice in the arson. Id. As a result of this admission, he was arrested and incarcerated at the Hartford correctional center. Id.

At his own request, the defendant was visited in jail by a friend, James Papagolas, on several occasions. Id., 183. On March 14, 1979, the police encountered Papagolas as he was cleaning out the defendant's car. Id., 186. Papagolas informed the police that he had visited the defendant, at the defendant's request, and would continue to visit him in jail. Id. The police discussed the victim's disappearance with Papagolas, who agreed to notify the police if he heard anything about the victim. Id. Papagolas arranged a meeting with the police on March 16, 1979, and a similar conversation occurred. On March 19, 1979, without notifying the police, Papagolas again visited the defendant. Id. When Papagolas asked the defendant whether he had killed the victim, the defendant answered affirmatively. Papagolas then left the jail, notified the police of the defendant's statement, and arranged to meet with them. He also informed the police that he planned on returning to the jail later that day to visit the defendant. Id. After learning that Papagolas did not possess a driver's license, the police drove Papagolas to the jail that evening, and also on two subsequent occasions. Id. Each time, the police waited for Papagolas outside of the jail and, during the ride home, Papagolas informed the police of what he had learned during his meeting. Papagolas' final visit occurred on March 22, 1979, when the defendant revealed the location of the body. Id., 186–87. Papagolas then led the police to the wooded area that the defendant had described, where they found the victim's body. Id., 182.

The trial court rendered judgment in accordance with the jury's verdict that the defendant was guilty of murder. Id., 181. On appeal, we affirmed the trial court's judgment and its determination that police involvement

was not so extensive as to have created an agency relationship between Papagolas and the police. Id., 187. We explained that, "[a]t the time he elicited [the defendant's] confession, Papagolas had had only minimal contact with the police and it [was] clear that he was acting by himself and on his own initiative." Id., 186. Although the police had asked Papagolas to let them know if he heard anything, that request alone did not create an agency relationship. Id. Furthermore, the police did not initiate contact with Papagolas or direct his activities. Id., 187. In addition, Papagolas had no previous affiliation with the police and was not rewarded monetarily or promised any favors in return for his cooperation. Id. Although the police had become increasingly involved by providing Papagolas with transportation to the jail, and there was conflicting testimony about whether the police had asked Papagolas to go to the jail to obtain more information or had simply supported his own decision to go there, we concluded that the record as a whole supported the trial court's conclusion. Id.

In the present case, our examination of the record reveals that there was substantial evidence for the trial court's conclusion that "Gluhosky was in no way acting as an agent of the government in obtaining the information and material which was utilized by Agent Tutty in drafting the search warrant." Here, as in *Alexander*, the police did not seek out Gluhosky and were not involved in his decision to obtain information regarding the defendant. Rather, Yale University, through Smith, referred the police to Gluhosky after Smith had informed the police regarding the defendant's computer activity. Furthermore, like the private citizen in *Alexander*, Gluhosky had no previous affiliation with the police and was not rewarded monetarily or promised any favors in return for his cooperation. Although there was conflicting testimony regarding whether the police had

asked Gluhosky to continue to provide them with more information or whether Gluhosky had decided independently to continue monitoring the defendant's computer activities, the record before us, in sum, as in *Alexander*, supports the trial court's conclusion that police involvement was not so extensive as to have created an agency relationship between Gluhosky and the police.

B

The defendant next claims that the trial court improperly ruled that the defendant had no reasonable expectation of privacy in the files, and, consequently, that the Yale police officers did not conduct a warrantless search when they viewed, in Gluhosky's absence, several files that Gluhosky had not previously viewed. He also challenges the trial court's determination that, even assuming arguendo that the viewing of the subject files constituted a warrantless search, it was harmless because, even if those files were disregarded, other information that Gluhosky had provided was sufficient to support a finding of probable cause for the warrant's issuance. We agree with the trial court's determination on this second ground. Accordingly, we need not decide whether the defendant had a reasonable expectation of privacy in the contents of his workplace computer under the federal and state constitutions.

The application and affidavit for a search warrant contained the following facts, attested to by Tutty. Gluhosky informed Tutty that he had started monitoring the defendant's computer activity on October 23, 1998, after another graduate student told him that an "individual using [the defendant's] workstation and password was viewing or downloading child pornography from the Internet . . . to [the sandbox computer]." On November 4, 1998, Tutty spoke to Gluhosky, who stated that over the last few weeks he had reviewed logs of the defendant's computer activity and found that the

individual using the defendant's workstation had used the defendant's password to download graphic images onto the sandbox computer. Gluhosky told Tutty that "on at least two occasions, while graphic image files were being downloaded by the individual using [the defendant's] workstation and password, [the defendant] was present in the geology department and at his workstation." In addition, Gluhosky informed her that someone had accessed the images from the computer in the defendant's master's residence and had copied the images from the sandbox computer to the master's residence computer, before deleting them from the sandbox computer. Tutty stated in the warrant affidavit that she "reviewed the graphic image files that Mr. Gluhosky printed from the 'sandbox' computer prior to their deletion. These images [were] primarily of a nude young boy in various poses." Tutty, in the warrant affidavit, did not rely upon graphic images that she or the Yale police viewed but that Gluhosky did not. Gluhosky also provided her with printouts from a log file that indicated that images with file names including "Boy15.jpg," "Jeremy04.jpg," "Analsex.jpg," "pdavid.jpg," and "xy10.jpg," had been transferred via file transfer protocol from the sandbox computer to the defendant's master's residence computer.

In support of his claim that the Yale police violated the fourth amendment by viewing files that Gluhosky had not viewed, the defendant relies on a line of cases in which the United States Supreme Court has held that, although "a wrongful search or seizure conducted by a private party does not violate the Fourth Amendment"; *Walter* v. *United States*, supra, 447 U.S. 656; "the Government may not exceed the scope of the private search unless it has the right to make an independent search." Id., 657. In *Walter*, for example, a private party had turned over to the FBI obscene films that had mistakenly been delivered to it. Id., 651–52. The FBI then

viewed the films without first obtaining a warrant. Id., 652. The United States Supreme Court held that "[t]he projection of the films was a significant expansion of the search that had been conducted previously by a private party and therefore must be characterized as a separate search. That separate search was not supported by any exigency, or by a warrant even though one could have easily been obtained." Id., 657. Accordingly, the court concluded that the viewing of the film violated the fourth amendment. Id., 659; see also *United States* v. *Rouse*, 148 F.3d 1040, 1041 (8th Cir. 1998); *United States* v. *Kinney*, 953 F.2d 863, 865–66 (4th Cir. 1992); *United States* v. *Donnes*, 947 F.2d 1430, 1434–35 (10th Cir. 1991). We conclude that we need not determine whether the Yale police conducted an illegal search by viewing files not viewed by Gluhosky because, even in the absence of that evidence, there was ample probable cause to obtain a search warrant.

"The law regarding probable cause and the standards for upholding the issuance of a search warrant are well established. We uphold the validity of [a search] warrant . . . [if] the affidavit at issue presented a substantial factual basis for the magistrate's conclusion that probable cause existed. . . . [T]he magistrate is entitled to draw reasonable inferences from the facts presented. When a magistrate has determined that the warrant affidavit presents sufficient objective indicia of reliability to justify a search and has issued a warrant, a court reviewing that warrant at a subsequent suppression hearing should defer to the reasonable inferences drawn by the magistrate. Whe[n] the circumstances for finding probable cause are detailed, whe[n] a substantial basis for crediting the source of information is apparent, and when a magistrate has in fact found probable cause, the reviewing court should not invalidate the warrant by application of rigid analytical categories."

(Internal quotation marks omitted.) *State* v. *Buddhu*, 264 Conn. 449, 459–60, 825 A.2d 48 (2003).

We conclude in the present case that the trial court reasonably could have concluded that the warrant affidavit contained sufficient facts to establish probable cause that the defendant's residence and office contained child pornography, even in the absence of the files that Gluhosky had not viewed. Tutty stated in her affidavit that Gluhosky had determined that an individual, who would have needed the defendant's password to access the system, used the sandbox computer regularly to access the Internet in the evenings. The individual then accessed, from a computer located within the defendant's master residence, the files that had been downloaded to the sandbox computer, and subsequently transferred the files to the defendant's master's residence computer before deleting them from the sandbox computer. In addition, Gluhosky had informed Tutty that on two occasions when an individual using the defendant's workstation and password downloaded graphic image files, he had verified that the defendant was in his office. Tutty stated that Gluhosky had informed her that he had been able to print numerous images that had been downloaded to the sandbox computer and subsequently transferred to the defendant's master's residence computer. Tutty had reviewed the graphic image files that Gluhosky had printed and she indicated that the images were primarily of a nude, young boy in various poses. Tutty concluded that, in her professional judgment and experience, the poses constituted lewd and lascivious exhibition of the genitalia. Furthermore, Tutty indicated that Gluhosky had informed her that additional images, which he did not print, included sexual contact between young boys and adult males. On the basis of the statements in Tutty's search warrant affidavit, the trial court reasonably could have concluded that the warrant affidavit con-

tained sufficient facts to establish probable cause that the defendant's residence and office contained child pornography, even in the absence of the files that Gluhosky had not viewed. Consequently, we need not determine whether the trial court properly concluded that the defendant had no reasonable expectation of privacy in the files and, therefore, that the Yale police officers did not conduct a warrantless search by viewing, in Gluhosky's absence, several files that Gluhosky had not previously viewed.

## C

The defendant next claims that the videotapes, upon which the criminal charges against him were based, should have been suppressed on the ground that the areas in which the items were found, labeled K and L on the floor plan of the defendant's residence, were not included in the search warrant as an area to be searched. We disagree.

The search warrant in the present case authorized the search of "[t]he premises known as the residential quarters and office for the Master of Saybrook College, Yale University, located at 90 High Street, New Haven, Connecticut as depicted below." In its ruling on the motion to suppress, the trial court stated that "[t]he defendant has produced no evidence that areas K and L are not part of Saybrook College." The defendant contends that the trial court improperly focused on whether areas K and L are part of Saybrook College, instead of on whether areas K and L were part of the master's residence. He further argues that, "[c]ontrary to the trial court's findings and decision, the evidence establishes that areas K and L were not part of the master's residence and office, and that the search therefore exceeded its lawful scope."

We agree with the defendant that the proper inquiry is whether areas K and L were part of the defendant's

master's residence, not just part of Saybrook College. We disagree, however, with the defendant's contention that the trial court's ruling reflected a misunderstanding of the defendant's legal challenge to the execution of the search warrant. Rather, we conclude that the trial court's opinion properly focused on the precise legal issue before it: whether areas K and L were outside the scope of the premises to be searched, namely, "[t]he premises known as the residential quarters and office for the Master of Saybrook College, Yale University, located at 90 High Street, New Haven, Connecticut as depicted below." We also conclude that the trial court properly determined that those areas were included in the search warrant.

The defendant argues that areas K and L are not part of the defendant's residence because: (1) they are not included within the dotted line that goes around the perimeter of the residence on the floor plan of the defendant's residence; (2) the physical layout of the area demonstrates that this area was not part of the master's residence; (3) there were sliding bolts and a deadbolt lock on the door between area M and areas K and L; and (4) areas K and L had a door that opened to an exterior hallway and had a mail slot and the number "1039" on it. Even if we assume that these facts are true, they do not establish that areas K and L were separate from the master's residence and office or that the search exceeded its lawful scope.

As the trial court correctly explained in its memorandum of decision, "areas K and L are included with Saybrook College on the records of Yale University. That area is accessible to the defendant who keeps a number of personal belongings there. Upon the execution of the search warrant the defendant led members of the search team to that area where his computer and accompanying material were located. Records of Yale indicate the likelihood that the defendant made and

received long distance calls from a telephone in that area.

"Any issues with respect to a number on the door leading from a common area to K and L, or locks on the door leading from area M to K and L, or the location of burglar alarm sensors are all explained by the fact that the area in question was moved from Branford College to Saybrook College in May of 1996." In light of the overwhelming evidence indicating that areas K and L were part of the master's residence, we conclude that the trial court correctly held that the search did not exceed its lawful scope.

## D

The defendant next claims that the evidence seized pursuant to the search warrant must be suppressed because the warrant was defective as it was based on an unconstitutional statute.[11] In addition, he argues that the evidence should not have been admitted because this court rejected, in *State* v. *Marsala*, 216 Conn. 150, 579 A.2d 58 (1990), the good faith exception to the exclusionary rule, as enunciated in *United States* v. *Leon*, 468 U.S. 897, 911–12, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1987), which noted that the court has not required suppression of evidence seized pursuant to a statute that is subsequently declared unconstitutional. Because we conclude that the search warrant was based on provisions of the statute that were not struck down as unconstitutional, we need not reach the defendant's second claim.

As a preliminary matter, we note that the trial court declined to decide this issue because "[t]he substantive issue of the constitutionality of the statute in question [had] not been briefed by the parties and it appear[ed]

---

[11] Attachment B of the warrant lists the items to be seized and refers to 18 U.S.C. § 2256 but does not refer to a specific subsection.

to the court that the defendant [was] raising it at [that] time in order to preserve any right that may arise in the future based upon the action of the United States Supreme Court" in *Ashcroft* v. *Free Speech Coalition*, 535 U.S. 234, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002). We conclude that, under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[12] the record is adequate to review the alleged claim of error and the claim is of constitutional magnitude alleging the violation of a fundamental right. The defendant has not established, however, that the alleged constitutional violation clearly exists and clearly deprived him of a fair trial. The defendant cannot, therefore, prevail on his unpreserved claim of constitutional error.

In *Ashcroft* v. *Free Speech Coalition*, supra, 535 U.S. 256, 258, the United States Supreme Court held unconstitutional portions of the Child Pornography Prevention Act of 1996 (act), 18 U.S.C. § 2251 et seq.,[13] that it

[12] In *State* v. *Golding*, supra, 213 Conn. 239–40, this court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt."

[13] The relevant sections of the act include §§ 2252A and 2256 of title 18 of the United States Code. Section 2252A of title 18 of the United States Code (1994 & Sup. IV 1998) provides in relevant part: "(a) Any person who . . .

"(5) . . .

"(A) . . . knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography . . . shall be punished as provided in subsection (b). . . ."

Section 2256 (8) of title 18 of the United States Code (1994 & Sup. IV 1998) provides in relevant part: " '[C]hild pornography' means any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where—

"(A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;

concluded were overbroad. The court determined that 18 U.S.C. § 2256 (8) (B) and (D) are overbroad and unconstitutional because they expanded the federal definition of child pornography to include sexually explicit images that appear to depict children but were not produced using real children. *Ashcroft* v. *Free Speech Coalition*, supra, 256–58. Section 2256 (8) (B) prohibits "any visual depiction . . . that is, or appears to be, of a minor engaging in sexually explicit conduct." (Internal quotation marks omitted.) Id., 241. "Section 2256 (8) (D) defines child pornography to include any sexually explicit image that was advertised, promoted, presented, described, or distributed in such a manner that conveys the impression it depicts a minor engaging in sexually explicit conduct." (Internal quotation marks omitted.) Id., 242. The federal statute, however, contains two other provisions on which the court did not render a decision: 18 U.S.C. § 2256 (8) (A) and (C). Id., 241–42. The court noted that 18 U.S.C. § 2256 (8) (A) prohibits images made using actual minors, and was based upon the types of images addressed in *New York* v. *Ferber*, 458 U.S. 747, 756–64, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982), in which the court distinguished child pornography videotapes from other sexually explicit speech on the basis of the state's interest in protecting children. *Ashcroft* v. *Free Speech Coalition*, supra, 241. Furthermore, although the court briefly discussed 18 U.S.C. § 2256 (8) (C), which prohibits "morphing,"[14] it did not consider the constitutionality of that

---

"(B) such visual depiction is, or appears to be, of a minor engaging in sexually explicit conduct;

"(C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct; or

"(D) such visual depiction is advertised, promoted, presented, described, or distributed in such a manner that conveys the impression that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct . . . ."

[14] In *Ashcroft* v. *Free Speech Coalition*, supra, 535 U.S. 242, the court explained that child pornographers use computer morphing to "alter innocent pictures of real children so that the children appear to be engaged in

subsection because the respondents did not challenge it. Id., 242.

In the present case, the defendant argues that of subdivisions (A) through (D) of 18 U.S.C. § 2256 (8) (1994 & Sup. IV 1998), which defined four categories of child pornography, only 18 U.S.C. § 2256 (8) (A) survived the decision in *Ashcroft* v. *Free Speech Coalition*, supra, 535 U.S. 234. In addition, he argues that Tutty's affidavit did not establish probable cause that the defendant possessed child pornography in books, magazines, or still photographs that displayed sexually explicit images of real children, as defined in 18 U.S.C. § 2256 (8) (A). Consequently, he contends, the evidence seized must be suppressed because the search warrant was based solely on the definitions of child pornography that the court struck down as unconstitutional in *Ashcroft* v. *Free Speech Coalition*, supra, 258. See, e.g., *State* v. *Marsala*, supra, 216 Conn. 171 ("a good faith exception to the exclusionary rule does not exist under Connecticut law").[15] We disagree.

In the present case, Tutty stated in the application and affidavit for a search warrant that she had been

sexual activity." The court explained that "[a]lthough morphed images may fall within the definition of virtual child pornography, they implicate the interests of real children and are in that sense closer to the images in *Ferber*." Id.

[15] Cf. *Michigan* v. *DeFillippo*, 443 U.S. 31, 40, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979) ("[t]he subsequently determined invalidity of the Detroit ordinance on vagueness grounds does not undermine the validity of the arrest made for violation of that ordinance, and the evidence discovered in the search of the respondent should not have been suppressed"); *United States* v. *Leon*, supra, 468 U.S. 918–25 (fourth amendment exclusionary rule does not apply to evidence obtained by police officers who acted in objectively reasonable reliance upon search warrant, ultimately determined to be unsupported by probable cause, issued by neutral magistrate); *Illinois* v. *Krull*, 480 U.S. 340, 356–60, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987) (good faith exception to fourth amendment exclusionary rule applies when officer's reliance on statute's constitutionality is objectively reasonable, but statute is subsequently declared unconstitutional).

employed as a special agent with the FBI for over seven years, and was a member of the Crimes Against Children Working Group, which was formed to identify, investigate, and prosecute individuals who import, distribute, and collect child pornography. She stated that she had been involved in numerous investigations "involving the receipt, transmission, and possession of child pornography, as that term is defined in title 18 of the United States Code, § 2256." Furthermore, she stated that "an individual who collects child pornographic images, does so in a variety of media, including magazines, photographs, videos and other visual media." On the basis of the information that Gluhosky provided to her and the information that she had reviewed, which is outlined in part I B of this opinion, coupled with her training and experience, she stated that "there is probable cause to believe . . . that now located within the premises known as the residential quarters and office of the Master of Saybrook College, that is the on-campus home of [the defendant], located at 90 High Street, New Haven, Connecticut as more particularly described in attachment A hereto, are fruits, instrumentalities and evidence of and concerning violations of title 18 of the United States Code, § 2252A (a) (5), possession of child pornography, as more particularly described in Attachment B hereto."[16]

---

[16] Attachment B outlined the items to be seized: "(1) Any and all books, magazines, movies, video tapes, video tape spools, photographs and/or undeveloped film, slides, and/or drawings or other visual media containing visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

"(2) Any and all envelopes, letters, and other correspondence containing information concerning the transmission, through any other common carrier or Internet service provider, of any visual depiction of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

"(3) Any and all tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, tape systems and hard drive[s] and other computer related operation equipment, in addition to

We determine that the magistrate who issued the warrant reasonably could have concluded, on the basis of the allegations in Tutty's warrant affidavit, that there was a probability or substantial chance that the defendant possessed materials meeting the definition set forth in 18 U.S.C. § 2256 (8) (A), which survived the court's decision in *Ashcroft* v. *Free Speech Coalition*, supra, 535 U.S. 234. Although Tutty did not specify that the materials met that definition, she stated in her affidavit that individuals who collect pornographic images do so through a variety of media, including magazines, photographs, videos and other visual media, and sought to seize such materials, as described in attachment B to her affidavit. As we have already concluded, there was ample probable cause to believe that the defendant collected such materials. Accordingly, we need not consider whether the warrant would have survived the invalidation of the entire federal statute.

## II

The defendant next claims that the trial court violated his right to counsel under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the constitution of Connecticut by denying his motion for a continuance to change counsel prior to the suppression hearing. We conclude that this claim is not reviewable because it neither falls within the narrow scope of § 54-94a,[17] nor establishes good cause meriting a rare exception to our general rule of unreviewability of claims following a plea of nolo contendere.

computer photographs, graphic interchange formats and/or photographs, slides or other visual depictions of such graphic interchange format equipment which may be, or are used to visually depict child pornography, child erotica, information pertaining to the sexual interest in child pornography, sexual activity with minors or the distribution, possession or receipt of child pornography, child erotica or information pertaining to an interest in child pornography or child erotica."

[17] For the text of § 54-94a, see footnote 10 of this opinion.

Section 54-94a allows a defendant to enter a plea of nolo contendere conditional on the right to take an appeal from the trial court's denial of a motion to suppress or motion to dismiss. "It is well established that an unconditional plea of guilty or nolo contendere, intelligently and voluntarily made, operates as a waiver of all nonjurisdictional defects and bars the later assertion of constitutional challenges to pretrial proceedings. . . . Therefore, only those issues fully disclosed in the record which relate either to the exercise of jurisdiction by the court or to the voluntary and intelligent nature of the plea are ordinarily appealable . . . ." (Internal quotation marks omitted.) *State* v. *Kelley*, 206 Conn. 323, 327–28, 537 A.2d 483 (1988). "[T]his court has been reluctant to invoke its authority to review an issue raised in connection with a conditional plea of nolo contendere when, as in this case, that issue does not fall within the narrow scope of § 54-94a." *State* v. *Revelo*, 256 Conn. 494, 503, 775 A.2d 260, cert. denied, 534 U.S. 1052, 122 S. Ct. 639, 151 L. Ed. 2d 558 (2001); see, e.g., *State* v. *Kelley*, supra, 335–36 (refusing to invoke supervisory authority to review claim not within purview of § 54-94a); *State* v. *Madera*, 198 Conn. 92, 99–102, 503 A.2d 136 (1985) (same).

We have made rare exceptions to our general rule of unreviewability when good cause is established. See, e.g., *State* v. *Revelo*, supra, 256 Conn. 503 (case presented rare exception to general rule of unreviewability of claims following plea of nolo contendere); *State* v. *Chung*, 202 Conn. 39, 44–45, 519 A.2d 1175 (1987) (invoking supervisory authority to review claim not within purview of § 54-94a).

In *Revelo*, the defendant contended that the trial court improperly had penalized him for exercising his right to a hearing on his motion to suppress by changing the terms of its plea offer from eight years to nine years imprisonment upon learning of the defendant's decision

to exercise that right. *State* v. *Revelo*, supra, 256 Conn. 496. We reviewed the defendant's claim, notwithstanding the fact that it did not fall within the narrow scope of § 54-94a. Three factors informed our decision to review his claim. Id., 503–504. "First, the defendant's due process claim [gave] rise to an important issue, namely, the proper role of our trial judges in the plea bargaining process . . . . Second, the undisputed facts of the case [bore] out the defendant's claim of a constitutional violation." Id. Third, we were compelled, in order to prevent trial courts from employing a practice that violated due process principles, to rectify Appellate Court dictum permitting the practice that the defendant challenged. Id., 504.

In the present case, the defendant's claim that the trial court improperly denied his request for a continuance to change counsel does not fall within the narrow scope of § 54-94a. Nor does it fall within the narrow exception described in *Revelo*. Although we recognize the importance of the defendant's claim that the trial court improperly denied his motion for a continuance to change counsel in violation of the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the constitution of Connecticut, the undisputed facts of this case do not clearly establish a constitutional violation. In addition, there is no need to overrule unconstitutional Appellate Court dictum in this case, as there was in *Revelo*. Consequently, we do not reach the merits of the defendant's claim.

The judgment is affirmed.

In this opinion the other justices concurred.