# STATE OF CONNECTICUT *v.* EVERTON GARDNER
## (SC 18071)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille,
Zarella and McLachlan, Js.*

Argued March 25—officially released June 22, 2010

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

*Heather M. Wood,* deputy assistant public defender, for the appellant (defendant).

*Timothy F. Costello,* deputy assistant state's attorney, with whom, on the brief, were *Gail P. Hardy,* state's attorney, *Vicki Melchiorre,* senior assistant state's attorney, and *Chris Pelosi,* assistant state's attorney, for the appellee (state).

*Opinion*

PER CURIAM. The defendant, Everton Gardner, was convicted after a jury trial of murder in violation of General Statutes § 53a-54a (a), carrying a pistol without a permit in violation of General Statutes § 29-35 (a), attempt to commit murder in violation of § 53a-54a (a) and General Statutes § 53a-49 (a) (2), assault in the first degree in violation of General Statutes § 53a-59 (a) (1), carrying a dangerous weapon in violation of General Statutes § 53-206 (a), burglary in the second degree in viclation of General Statutes § 53a-102 (a), and criminal violation of a protective order in violation of General Statutes § 53a-223 (a). The defendant appeals[1] from the judgment of conviction claiming that the trial court

[1] The defendant appeals directly to this court from the judgment of the trial court pursuant to General Statutes § 51-199 (b) (3).

improperly denied his motion to suppress a statement that he had given to the police on the ground that he had not voluntarily waived his *Miranda*[2] rights and that he had not voluntarily given the statement. The defendant also raises the unpreserved claims that the trial court improperly permitted the state to introduce evidence of uncharged misconduct and physical evidence that had been seized by hospital staff and delivered to the police in violation of his rights under the fourth and fourteenth amendments to the United States constitution. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant and his wife, Diane Lurry, lived at 53 Giddings Street in Hartford. In May, 2003, after the defendant assaulted Lurry, she obtained a protective order that prohibited the defendant from entering their residence or from contacting, harassing or assaulting her. Pursuant to the protective order, the defendant removed himself from the residence.

Lurry testified that the defendant kept a key to the residence, however, and, on two occasions, entered the residence and forced Lurry to have sex with him. In July, 2003, Lurry changed the locks on the house. Meanwhile, Lurry had begun dating Edward Coletosh. When the defendant learned about Lurry's relationship with Coletosh, he became angry and called Lurry numerous times, threatening to kill her.

On September 27, 2003, Lurry discovered signs that someone had attempted to break into her residence. She called the Hartford police department and Officer Daniel Goicochea responded. Upon investigation, Goicochea discovered that someone had entered Lurry's basement through a window and had then attempted to enter the main floor of the residence by prying open

[2] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

the basement door. Lurry told Goicochea that she suspected that the intruder had been the defendant. Because she was frightened, Lurry called Coletosh and asked him to come to the residence. Coletosh came and stayed with Lurry.

Later on the evening of September 27, 2003, the defendant parked his car on Wilbur Street, which runs behind Lurry's residence, parallel to Giddings Street. At approximately 2 a.m. on the morning of September 28, 2003, Lurry and Coletosh were awakened by noise outside the residence. Upon looking out the kitchen window, they saw the defendant standing on a chair in the backyard and looking in a window. Lurry and Coletosh returned to the bedroom and dressed. Coletosh then went to the front door and opened it. The defendant was standing on the front steps, opening the exterior screen door. He raised a gun and shot Coletosh in the chest.

The defendant and Coletosh then engaged in a struggle for the gun, during which both the defendant and Coletosh incurred gunshot wounds. Coletosh attempted to run away from the defendant, but the defendant chased him. Eventually, Coletosh ran up Giddings Street and the defendant entered the residence. Lurry, who was attempting to dial 911, saw the defendant and ran out the front door, with the defendant in pursuit. Lurry ran toward a neighboring house while the defendant attempted unsuccessfully to reload his gun. Having failed to reload the gun, the defendant retrieved a machete. When Lurry tripped and fell in the driveway of the residence at 58 Giddings Street, the defendant attacked her with the machete. Lurry eventually decided to pretend that she was dead and the defendant went away. Lurry then rang the doorbell of the residence at 58 Giddings Street. She collapsed as the residents came to the door. Lurry sustained serious injuries,

but survived the defendant's attack. Coletosh died of his wounds.

Thereafter, the defendant was arrested and charged with murder, carrying a pistol without a permit, attempt to commit murder, assault in the first degree, carrying a dangerous weapon, burglary in the second degree and criminal violation of a protective order. Before trial, the defendant filed a motion to suppress a statement that he had given to Robert Davis, a detective with the Hartford police department, on September 28, 2003. The defendant argued that he had not knowingly and voluntarily waived his *Miranda* rights before giving the statement and that he had not knowingly and voluntarily given the statement. After conducting a hearing on the motion, the trial court issued a memorandum of decision in which it found the following facts. The defendant was admitted to Hartford Hospital on September 28, 2003, for treatment of a gunshot wound to his thigh. He underwent surgery from approximately 4 a.m. to approximately 7 a.m. The defendant received general anesthesia during the surgery and, afterward, he was placed in the intensive care unit. At approximately 7 a.m., the defendant received two to four milligrams of dilaudid, a pain medication. He did not receive another dose of the pain medication until 9 p.m. *State* v. *Gardner*, 51 Conn. Sup. 420, 421, 1 A.3d 271 (2007).

At approximately 3:30 p.m., Davis arrived at Hartford Hospital. Upon his arrival, Davis relieved another police officer who had been stationed outside of the defendant's room in the intensive care unit. At approximately 7:30 p.m., the defendant was seen by the attending physician. Thereafter, Davis spoke with the attending physician, who told Davis that the defendant could be interviewed. The defendant's medical records state that the defendant was " 'awake, alert, oriented to place, person, [and] time' " at 8 p.m. Id. Davis began his interview of the defendant at approximately 8:30 p.m. He

described the defendant's condition as alert, conscious, awake, normal and lucid. On the basis of Davis' prior experience of interviewing hundreds of people under the influence of drugs and alcohol, he determined that the defendant was not under such an influence and was competent to give a statement. Id.

By the time that Davis interviewed the defendant, the defendant had already been placed under arrest. When Davis entered the hospital room, he was dressed in plain clothes with a polo style shirt with a Hartford police logo sewn on it. He identified himself to the defendant as a police officer and showed him his badge. Davis then read the defendant his *Miranda* rights from a preprinted form. The defendant interrupted Davis and said that he understood his rights. Nevertheless, Davis continued to read the preprinted form in its entirety. After Davis read the defendant his rights, neither Davis nor the defendant signed or made any mark on the *Miranda* rights form. The defendant stated that he understood his rights and was willing to speak with Davis, but did not want to sign the form. After the interview, Davis asked if the defendant wished to make a written statement. The defendant declined to do so. Id., 422.

On the basis of these facts, the trial court concluded that the state had proved by a preponderance of the evidence that the defendant voluntarily had waived his *Miranda* rights. Id., 423. Accordingly, it denied the defendant's motion to suppress. Id., 425.

At trial, Davis testified that the defendant had told him during the interview on September 28, 2003, that he had driven to 53 Giddings Street sometime in the very early morning hours on that date. When he arrived, he saw a car that he recognized as belonging to a drug dealer with the nickname Ding Dong. The defendant believed that Ding Dong previously had paid Lurry for

sex. He entered the residence and saw Lurry and Ding Dong engaged in a sex act. He then retrieved a revolver that he kept concealed under the carpet in the bedroom, intending only to threaten Ding Dong with it. After he threatened Ding Dong, a fight ensued and the gun fired one or two times. Thereafter, the defendant retrieved a machete from under a couch in the living room, intending to strike Lurry with the flat side of the machete, not the sharp edge.

On appeal, the defendant claims that the trial court improperly denied his motion to suppress this evidence because he had not knowingly and voluntarily waived his *Miranda* rights before giving the statement to Davis and he had not voluntarily given the statement. Specifically, he claims that his waiver of his rights and statement were not knowing and voluntary because: he was a native of Jamaica with only a limited experience with the American criminal justice system and a limited understanding of his constitutional rights;[3] he was in serious pain and under the influence of numerous medications when he waived his rights and gave the statement to Davis; and he was not able to leave the hospital room because of his medical condition. In addition, he claims that the fact that he did not sign the waiver form indicates that he did not waive his rights.

Our examination of the record on appeal, and the briefs and arguments of the parties, persuades us that the ruling of the trial court on the defendant's motion to suppress should be affirmed. Because the trial court's memorandum of decision fully addresses the arguments raised in the present appeal, we adopt the trial court's well reasoned decision as a statement of the facts and the applicable law on these issues. See id., 420. It would

---

[3] In support of this claim, the defendant relies on testimony that he gave at trial, after the hearing on the defendant's motion to suppress his statement to Davis.

serve no useful purpose for us to repeat the discussion therein contained.[4] *Morrissey* v. *Yale University,* 268 Conn. 426, 428–29, 844 A.2d 853 (2004); *Stebbins* v. *Doncasters, Inc.,* 263 Conn. 231, 234–35, 819 A.2d 287 (2003); *Norfolk & Dedham Mutual Fire Ins. Co.* v. *Wysocki,* 243 Conn. 239, 241, 702 A.2d 638 (1997).

The defendant also claims for the first time on appeal that the trial court improperly admitted evidence of uncharged misconduct. Specifically, he claims that the trial court improperly allowed Lurry to testify that, on several occasions prior to the night of the assault and murder, the defendant had entered her residence and forced her to have sex with him. The defendant seeks review of this unpreserved claim under *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[5] We conclude that this claim is not of constitutional magnitude. *State* v. *Silva,* 201 Conn. 244, 250, 513 A.2d 1202 (1986) ("the erroneous introduction of prior misconduct evidence involves a claim arising under state law and does not involve any constitutional right"). Accordingly, it fails under the second prong of *Golding.*

Finally, the defendant claims for the first time on appeal that the seizure of his personal effects by Hart-

---

[4] The defendant points out that the trial court's memorandum of decision on the motion to suppress addressed only his claim that he had not voluntarily waived his *Miranda* rights, and did not specifically address his claim that his statement to Davis was not made knowingly and voluntarily. Because the defendant makes the same arguments in support of both claims, it is clear to us that the trial court implicitly rejected the former claim when it rejected the latter.

[5] To prevail under *Golding,* the defendant must establish all of the following conditions: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Golding,* supra, 213 Conn. 239–40.

ford Hospital personnel and the delivery of those effects to Thomas Hardwick, a Hartford police officer, constituted a warrantless search in violation of his rights under the fourth and fourteenth amendments to the United States constitution because hospital personnel were acting as agents for the police. He again seeks review of this unpreserved claim under *Golding*. Because the defendant did not raise this claim in the trial court, however, there is no evidence in the record relating to the factual question of whether hospital personnel acted as agents for the police when they gathered the defendant's belongings and turned them over to Hardwick.[6] Accordingly, we conclude that the record is inadequate for review and that the claim fails under the first prong of *Golding*.

The judgment is affirmed.

---

[6] The defendant claims that the record is adequate for review and points to Hardwick's testimony concerning the circumstances surrounding his receipt of the defendant's belongings from the hospital personnel. That evidence is not adequate, however, for this court to determine whether the hospital personnel were self-motivated, whether Hardwick asked the hospital personnel "to obtain [the] incriminating evidence and placed [them] in a position to receive it . . . and whether the information [was] secured as part of a government initiated, pre-existing plan." (Internal quotation marks omitted.) *State* v. *Lasaga*, 269 Conn. 454, 464, 848 A.2d 1149 (2004).

* The listing of justices reflects their seniority status on this court as of the date of oral argument.